# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1026

_____

|  |  |  |
|---|---|---|
| Cedar Hill Hardware and Construction Supply, Inc., a Missouri Corporation, | * * * | |
| Plaintiff - Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the Eastern District of Missouri. |
| Insurance Corporation of Hannover, | * * | |
| Defendant - Appellee. | * | |

_____

Submitted: March 10, 2008
Filed:  April 17, 2009

_____

Before WOLLMAN, BOWMAN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

A jury found that Plaintiff-Appellant Cedar Hill Hardware and Construction Supply, Inc. ("Cedar Hill"), was not entitled to insurance coverage for fire-related damages because Cedar Hill made material misrepresentations that voided an otherwise applicable policy.  Cedar Hill appeals, arguing waiver, error in the jury instructions, and error in the district court's[1] admission of evidence and imposition of time constraints at trial.  Cedar Hill also argues the district court erred when it granted

_____

[1]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

a post-trial motion ordering Cedar Hill to pay restitution to Defendant-Appellee Insurance Corporation of Hannover ("Hannover") for sums that Hannover advanced to Cedar Hill during investigation of the fire and sums that Hannover paid to Cedar Hill's mortgage holder. We affirm.

I. Background

A. General Background

Cedar Hill operated a retail hardware store and equipment-rental business. On February 22, 2003, a fire caused substantial damage to Cedar Hill's facilities and inventory. Cedar Hill sought coverage under an insurance policy issued by Hannover. The circumstances of the fire were suspicious. A state fire marshal told Hannover he believed that the fire was intentional and that a principal of Cedar Hill had started the fire. Hannover commenced an investigation. Experts' opinions were mixed as to whether the cause of the fire was intentional or undetermined. Cedar Hill submitted a proof-of-loss form seeking payment in an amount near the policy limits, including a claim for business interruption, but Cedar Hill was not forthcoming with documents or other support for its claim.

Eventually, Hannover instituted an action seeking a declaration that it had no duty to provide coverage to Cedar Hill. Hannover raised three defenses to coverage: (1) arson, (2) misrepresentations in the claims process, and (3) breach of the policy's cooperation clause. Cedar Hill instituted a separate action alleging breach of contract and vexatious refusal to pay. The district court dismissed Hannover's initial action, and Hannover refiled its declaratory-judgment claims as counterclaims and affirmative defenses in Cedar Hill's action. In investigating the matter further, Hannover discovered an undisclosed second mortgage on the insured property. Hannover then raised Cedar Hill's failure to disclose the second mortgage when procuring insurance as a further argument in favor of a declaration that Hannover owed no duty to provide

coverage. Specifically, Hannover argued that Cedar Hill's failure to disclose the second mortgage served as an intentional, material misrepresentation or omission regarding Cedar Hill's interest in the insured property and that Missouri law and the terms of the policy treated this as grounds for voiding the policy.

The dispute went to trial, and the district court bifurcated the trial. The first phase dealt with Hannover's arson defense. The second phase dealt with Hannover's other defenses and Cedar Hill's claims of vexatious refusal to pay and breach of contract. The jury found in favor of Cedar Hill in the arson phase. Hannover does not appeal from that phase of the trial, and we need not recount the factual details of the fire.

In the second phase, the jury rejected Cedar Hill's breach of contract and vexatious refusal to pay claims. The jury also rejected Hannover's claim that the policy was void due to Cedar Hill's failure to comply with the cooperation clause. The jury, however, found for Hannover on the claim that the policy was void due to Cedar Hill's intentional and material misrepresentations. It is unclear from the verdict whether the jury found a misrepresentation or omission as to a mortgage or as to the insurance claim. Even though the jury found in favor of Hannover on the misrepresentation claim, it awarded zero damages to Hannover. After the trial, the district court granted a motion by Hannover and ordered Cedar Hill to pay restitution. We address below facts relevant to the issues on appeal.

B. Cedar Hill's History and the Insurance Application Process

Brad and Denise Burgan (the "Burgans") are the owners of Cedar Hill. They purchased the business as a going concern from Russell and Elaine Rose (the "Roses") in September 1996. The Burgans financed the business with a mortgage of over $400,000 from the Roses and a secured line of credit of over $300,000 from

Rockwood Bank. Rockwood Bank's security interest extended to Cedar Hill's equipment, business contents, and real property.

Cedar Hill used an insurance agent, Pete Nichols of Wilkerson Insurors, Inc., to obtain insurance. Nichols procured policies for Cedar Hill from Vesta Insurance Company ("Vesta") for 1996 to 1998. The 1998 Vesta policy, included in the underwriting file for subsequent years, listed the Roses and Rockwood Bank as loss payees, but it did not indicate that these parties were mortgage holders.

In 1999, Nichols sought coverage from other insurers on behalf of Cedar Hill. Nichols used an industry-standard application form called an "Acord" application. Nichols "blast-faxed" the Acord application to several insurers seeking quotes for coverage on Cedar Hill's business. The 1999 application listed three loss payees (two equipment-finance companies and a construction firm) but listed neither the Roses nor Rockwood Bank. The application also contained a box to check if there were mortgagees or lienholders and included a space beside the box for identification of such parties. Neither Nichols nor Cedar Hill checked the box to disclose the mortgages held by the Roses and Rockwood Bank.

An underwriting firm, F.B. Beattie and Co., responded to the blast-faxed Acord application on behalf of Safeco Insurance Company ("Safeco"), sought additional information, and eventually provided a quote and issued a Safeco policy to Cedar Hill for September 30, 1999 to September 30, 2000. In response to a request for additional information, Nichols submitted an ARA membership form and an application that the parties refer to as an "ARA" application, both signed by the Burgans.[2] Like the 1999

_____

[2]"ARA" refers to the American Rental Association, a trade group composed of equipment-rental businesses. Because equipment-rental businesses place potentially dangerous equipment in the hands of potentially unskilled users, such businesses present many opportunities for risk. Equipment-rental businesses historically found insurance expensive and difficult to procure. As a service to its members, ARA

-4-

Acord application, the 1999 ARA application contained a space for listing mortgage holders, but Nichols and the Burgans failed to list the Rockwood Bank or Rose mortgages.

After Safeco issued the 1999 policy, the Wilkerson agency notified Safeco of the Roses' mortgage. Safeco then amended the policy with an endorsement to list the Roses' mortgage interest and to name the Roses as loss payees. Although Cedar Hill's agent specifically informed Safeco of the Roses' mortgage, neither Cedar Hill nor its agent informed the insurer or underwriter of Rockwood Bank's mortgage nor sought to add Rockwood Bank to the policy as a mortgage holder. Safeco continued to insure Cedar Hill for the following two years. For policies issued in September 2000 and 2001, ARA served as the underwriter for Safeco and did not require a complete re-application process. Rather, ARA sought updated information and corrections. When responding to these update requests, Nichols and the Burgans again failed to disclose the Rockwood Bank mortgage. Safeco discontinued its coverage of hardware store and equipment rental businesses in 2002.

For 2002, ARA served as an underwriter of policies for Hannover. In July 2002, ARA requested updated information from Cedar Hill, but ARA did not seek a new application. The request, sent to Nichols at the Wilkerson agency, did not specifically ask for details regarding mortgages. It did, however, quote insurance with

_____

formed a group, ARA Insurance Services (also referred to herein as "ARA"), to act as a group sponsor for liability insurance. ARA assists in the procurement of insurance and shares a portion of the risk with the insurance companies that issue policies to ARA members. In this manner, ARA helps control members' insurance expenses. Although ARA initially may have served only as a sponsor, it is undisputed that ARA served as an underwriter under contract with insurance providers after 1999. For the policy at issue in the present case, covering the period from September 30, 2002 to September 30, 2003, ARA served as the outsourced underwriter for Hannover. For the purpose of our present discussion, neither party denies that information conveyed to ARA is deemed to have been conveyed to the insurance company.

a twenty-percent increase in coverage and ask for corrected and updated information. Nichols failed to provide updated information by the deadline listed on the request. Nevertheless, Cedar Hill, through Nichols, paid the premium for policy renewal at the increased level of coverage, accepting the quote with the increase in coverage. Hannover, through ARA, issued a policy for September 30, 2002 to September 30, 2003. At the time, ARA had in its possession the prior policies and applications discussed above. When Hannover issued the 2002–2003 policy, it provided Nichols with information regarding the policy and a request to review the policy and report any inaccuracies, errors, or omissions.

In November 2002, subsequent to issuance of the 2002–2003 policy, Nichols reported to ARA that the Roses' mortgage was not listed on the policy. ARA and Hannover issued an amendment to the 2002–2003 Hannover policy listing the Roses as mortgagees and additional insureds. Neither Nichols nor Cedar Hill notified Hannover or ARA of the Rockwood Bank mortgage nor sought to add Rockwood Bank to the policy.

For the years discussed above, Nichols issued numerous certificates of insurance to Rockwood Bank as evidence that Cedar Hill had obtained insurance. The certificates stated that they did not amend the policies and that they were provided to Rockwood Bank only for informational purposes. The certificates did not indicate that Rockwood Bank was a mortgage holder nor state why Rockwood Bank had sought assurance of Cedar Hill's insurance status.

Nichols was without authority to issue such certificates, and in early 2002, when ARA discovered that Nichols had issued a certificate for the policy in effect from September 2001 through September 2002, ARA instructed Nichols that "all such certificates must be issued by our office." The Wilkerson agency, nevertheless, issued a certificate of insurance to Rockwood Bank in October 2002 without disclosing the certificate to ARA.

C. Cedar Hill's Claim Submission and Hannover's Response

The fire occurred in February 2003. Shortly after the fire, a state fire marshal told Hannover that he believed the fire was intentional and Brad Burgan was responsible. Hannover[3] sent a notice to Cedar Hill that included a proof-of-loss form and asked Cedar Hill to fill out the form. Hannover highlighted those portions of the policy that required cooperation from the insured and that called for a detailed listing of items claimed as damaged. The notice specifically stated, "Please note that Insurance Corporation of Hannover is also requesting that you provide complete inventories of all damaged and undamaged property as required by the conditions set forth above."

Cedar Hill submitted a one-page, sworn proof of loss on April 11, 2003, seeking $1.74 million. The proof of loss named Rockwood Bank and the Roses as lien holders, but it did not indicate what property was subject to liens. Accordingly, the proof of loss, on its face, did not indicate that Rockwood Bank was a mortgage holder rather than merely the holder of a lien against equipment or inventory. Hannover did not immediately investigate the nature of Rockwood Bank's interest. Upon receiving proof of the outstanding principal and interest on the Rose mortgage, however, Hannover paid the Roses $423,035.19. There is no allegation of delay or vexatiousness regarding Hannover's payment to the Roses.

Hannover commenced its investigation shortly after the fire, hiring engineers, technical experts, and a forensic accountant to review the amount of the loss. Hannover used a law firm that specializes in the areas of insurance fraud and arson to

---

[3]Hannover outsourced its claim-management functions to Berkeley Risk Administrators and its claim adjustment in this case to an independent firm, GAB Robins. It is undisputed that Hannover is responsible for the actions of its outsourced agents. Except where necessary for clarity, we refer to these firms collectively as Hannover.

coordinate its investigation. Early in the investigation, Hannover advanced $50,000 to Cedar Hill, even though Hannover suspected the fire was intentional. Throughout 2003 and into 2004, Hannover sought additional details to support Cedar Hill's one-page proof of loss, but Cedar Hill was not forthcoming until April 2004, at which time Cedar Hill made a partial disclosure of itemized information. Eventually, Hannover concluded that Cedar Hill had overstated its losses by approximately $1 million. This perceived overstatement of losses was the foundation for Hannover's initial misrepresentation-based defense to coverage. At no time did Hannover accept or deny the claim. Rather, Hannover filed the declaratory-judgment action seeking judicial resolution of the coverage issue.

D. Discovery and Pre-trial Motions

Hannover filed its initial complaint on June 5, 2004. Cedar Hill filed a separate action. In its initial complaint, Hannover alleged an arson defense, a misrepresentation defense, and a failure-to-cooperate defense. The misrepresentation defense, as originally pleaded, alleged misrepresentations regarding the fire and the claim but not regarding mortgages or Cedar Hill's interest in the insured property. On January 1, 2005, after the district court consolidated the cases, Hannover presented its claims as affirmative defenses and counterclaims. It then included allegations that Cedar Hill had made policy-voiding misrepresentations while procuring insurance.

Based on Hannover's allegations regarding misrepresentations in the procurement of insurance, Cedar Hill sought discovery as to underwriting standards. Cedar Hill sought to show that no misrepresentations or omissions were material to the decision to issue insurance or price the insured risk. Cedar Hill invoked Federal Rule of Civil Procedure 30(b)(6) and sought to depose a Hannover corporate representative as to all issues in the case, including the issue of underwriting standards. Hannover designated Richard Peterson.

During his deposition on October 7, 2005, Peterson proved unknowledgeable as to underwriting standards and was unable to answer specific questions regarding the impact that the undisclosed mortgage information would have had on Hannover's decision to insure a risk or on its calculation of premiums. Peterson explained that ARA had served as the underwriter for the policy and that ARA had exercised delegated authority to make underwriting decisions on lines of coverage up to $2 million. He stated that an ARA representative would have information regarding the specific standards used in association with making the underwriting decision.

Cedar Hill and its agent knew prior to the fire that ARA was the underwriter through whom they had obtained insurance. In addition, prior to Peterson's deposition, Hannover disclosed information to Cedar Hill regarding underwriting. In an initial Rule 26(a)(1) disclosure provided to Cedar Hill on December 23, 2004, Hannover identified Cindy Prowell as a person knowledgeable as to underwriting. Also, on August 15, 2005, Hannover submitted an affidavit from Phil Kelling, President of ARA, in which Kelling stated that he had personal knowledge regarding the underwriting of property and casualty policies by ARA and personal knowledge regarding Cedar Hill's file. Cedar Hill's attorneys stated during Peterson's deposition that they were aware of Kelling's affidavit. Finally, in a supplemental disclosure under Federal Rule of Civil Procedure 26(a)(1)(A), which Hannover claims to have provided to Cedar Hill on December 12, 2005, Hannover disclosed Kelling as a person with knowledge pertaining to "the underwriting file and other related matters."[4]

Cedar Hill did not attempt to depose Kelling or Prowell at any time prior to trial. Also, Cedar Hill did not seek assistance from the court regarding Hannover's

---

[4]Cedar Hill and its attorneys claim that they did not receive this supplemental disclosure. There is pending in our court a motion to strike the supplemental Rule 26 disclosure. We have taken the motion for consideration with the case. In light of our resolution of this case, which is not dependent upon the supplemental disclosure, we deny the motion as moot.

failure to designate a corporate representative knowledgeable as to the underwriting aspect of Cedar Hill's multi-faceted request for information. On February 13, 2006, however, Cedar Hill filed a motion in limine seeking to preclude Hannover from presenting any evidence on the topic of underwriting standards. Cedar Hill sought this exclusion as a sanction for designating an inadequate corporate representative. The district court denied the motion.

When Hannover deposed Cedar Hill's experts and obtained statements under oath from potential witnesses, it became clear that Hannover had not received all documents relevant to the itemized listings needed to support Cedar Hill's sworn proof of loss. Hannover eventually obtained an order from the district court directing Cedar Hill to disclose previously withheld documents relevant to Cedar Hill's claim as set forth in the sworn proof of loss. At trial, Hannover's accounting expert testified as to the amount of Cedar Hill's loss based, in part, on these documents.

Cedar Hill moved the court for an order compelling Hannover to produce its communications with the law firm that coordinated Hannover's investigation of the fire. The court granted the motion, ultimately ruling that privilege had been destroyed. Based on this determination, the court ruled that an insurance-industry expert working for Cedar Hill could rely upon and reference Hannover's attorney-client communications in his testimony.

Prior to trial, Cedar Hill filed several motions in limine seeking to exclude a wide variety of evidence and testimony. This evidence, in broad categories, included: (1) prior insurance claims and fires involving the Burgans or persons closely related to the Burgans; (2) "rumor, gossip, and innuendo"[5] regarding suspicious actions by

---

[5]Although Cedar Hill characterized much of the evidence as gossip, rumor, or innuendo, the evidence, in large part was testimony recounting employees' and former employees' observations of Brad Burgan or their recitation of instructions received from Brad Burgan.

Brad Burgan prior to the fire; and (3) expert testimony of Lewis Christ, a former Director of Insurance for the State of Missouri, regarding insurance-industry standards, the vexatious-refusal claim, the breach-of-contract claim, the materiality of misrepresentations or omissions regarding the Rockwood Bank mortgage, and the opinion that Brad Burgan had caused the fire. The district court ruled on the motions in limine, holding that evidence of the prior claims and fires was to be excluded. The court permitted some, but not all of the purported "rumor, gossip, and innuendo" to be admitted as circumstantial evidence in the arson phase. As described by the district court, the evidence admitted showed that:

> Brad Burgan stored a large amount of paint thinner on the premises, that he told the employees to leave the office door propped open at night, to chain the gates at night, and to park heavy equipment in front of the gate at night, that he installed a new thermostat for a furnace, that he had flammable items stored near a furnace, and that he "tampered" with the alarm system.

Regarding Hannover's insurance-industry expert, Lewis Christ, the district court ruled that Christ could testify in the second phase, if necessary, to illustrate the propriety of Hannover's claim handling and investigation. The district court ruled Christ could not offer testimony in the first phase as evidence to support a finding of arson.

E. The Trial

The first phase of the trial lasted twenty-nine trial days over the course of two months. The jury ultimately rejected Hannover's arson defense. Throughout the protracted first phase, the jury heard a good deal of information relevant to the issues reserved for the second phase. For example, in presenting different theories regarding the cause of the fire, the jury was made aware of the extent of the damage at Cedar Hill's store. Further, the jury heard information regarding Cedar Hill's financial

-11-

condition, offered by Hannover's witnesses as circumstantial evidence to show that Brad Burgan had a motivation to commit arson.

At the outset of the second phase, the district court expressed frustration with the length of the first phase. The court was frustrated with the attorneys for conducting unnecessarily prolonged examinations and cross-examinations, contesting procedural matters that did not need to be contested, repeatedly moving for mistrials, unnecessarily seeking intervention from our court, and repeatedly demanding frivolous and time-consuming sidebars. The court noted in particular that it had already demanded a great deal of time from the jurors and did not want the second phase to be as protracted. The court stated that if the entire trial lasted too long there would be a risk of losing one or more jurors to illness or unavoidable conflict and that such a loss might result in an insufficient number of jurors and a need to retry the entire case. The district court also noted that a good deal of evidence relevant to the issues for the second phase came in during the first phase. As a result, the court imposed time limitations for the second phase, giving each side eight hours to present its case and conduct cross-examinations. Cedar Hill repeatedly objected to the time limits. Hannover also objected, but the court remained firm.

Cedar Hill also moved the court to exclude entirely the issue of misrepresentations in the procurement of insurance. Cedar Hill argued Hannover had waived this issue by not raising it in a timely fashion after receipt of the sworn proof of loss and by not including this issue in the original declaratory judgment complaint. The district court denied Cedar Hill's motion.

In the second phase, the district court revisited its earlier evidentiary rulings and held most of the previously excluded evidence admissible. In Cedar Hill's presentation of its case, Cedar Hill read several witnesses' deposition testimony into the record and also presented in-court witnesses. One in-court witness, Walter Zimmer, was an insurance-industry expert offered to discuss industry standards and

opine as to the vexatious nature of Hannover's claim handling. Zimmer reviewed the correspondence between Hannover and its attorneys and incorporated these materials as foundations for his expert opinions and testimony. The district court rejected Hannover's objections to Zimmer's testimony and his reliance on the attorney-client communications.

At the close of its presentation of evidence in the second phase, Cedar Hill renewed its objection to the time constraints and made an offer of proof as to several witnesses it desired to present. The offer of proof consisted of the identification of several witnesses and unadorned claims as to the topics they would have addressed.

When Hannover presented its case, it began with William Dunn, a detective corporal with the Jefferson County Missouri Sheriff's Office. Over objection from Cedar Hill, Dunn testified that he had concluded Brad Burgan had intentionally set the fire. Dunn had been present at the scene on the night of the fire and had spoken with Brad Burgan that night. In addition, Dunn had spoken to several Cedar Hill employees and former employees who reported that Brad Burgan had previously made false claims to suppliers, claiming undamaged items as damaged. These former employees also reported several suspicious actions by Brad Burgan shortly before the fire. For example, one employee, Greta Milne, reported to Dunn that she and another employee had noted excess shipments of paint thinner and had taken pictures of leaking containers of paint thinner because they believed Brad Burgan was preparing the store for a fire. In fact, they provided the photographs for Dunn's file. In addition, Dunn testified as to his investigation of a prior fire at the Burgan's home, for which the cause was undetermined. Dunn ultimately produced a sixty-eight-page document consisting of reports of statements from witnesses and his conclusions based on those statements. The district court permitted Hannover to examine Dunn extensively regarding the report and permitted Hannover to place the report itself into evidence.

Hannover next presented a state fire-marshal investigator, Robert Jacobson, who had previously investigated a house fire at the Burgans' home. Jacobson reported to Hannover shortly after the Cedar Hill fire that he believed Brad Burgan had intentionally set the fire.

Hannover also presented the testimony of its forensic accountant, Randall Wilson, to discuss the extent of Cedar Hill's loss as contrasted with the extent of Cedar Hill's claim. Wilson had already testified in the first phase of the trial. In the second phase, Wilson testified based on several sources of information, including tax returns, Brad Burgan's testimony during an examination under oath, partial records provided by Cedar Hill during litigation, and Cedar Hill's sworn proof of loss. He testified specifically as to different categories of property included in the claim, the support or lack of support for claimed amounts, and several accounting discrepancies that were not explained or documented by Cedar Hill. In addition, he explained that many items he relied upon for his calculations were not disclosed until after many months of discovery and, in some instances, after the court ordered Cedar Hill to produce the documents. Finally, he explained his disagreement with accounting assumptions Cedar Hill had made in the course of developing its claim.

Wilson stated that the Burgans had submitted a claim for $1.74 million actual cash value without reference to replacement cost. Wilson testified that he believed the claim was fraudulent and overstated by almost $1 million. He explained his calculations regarding specific categories of insured property. For example, he stated that the actual cash value of the building was $237,000 but that Cedar Hill sought $480,000. He stated there was a claim for $319,000 in inventory and equipment but that Cedar Hill had provided no documentation to support the claim. Wilson testified in detail as to his determination that Cedar Hill had lost rental equipment with a cash value of approximately $95,000 but had claimed a loss of $323,000. Wilson also testified that Cedar Hill had made a $172,000 adjustment in its books in December 2002 to mark up its store inventory but that there was no explanation, documentation,

or justification for the mark-up and no record of purchases to support the mark-up. Wilson also testified that Brad Burgan made misrepresentations regarding Cedar Hill's inventory under oath. Finally, Wilson testified that Cedar Hill claimed $300,000 for business-interruption loss. Wilson explained that this amount should have been $66,500 "based upon the net profit or net loss that the business would have had absent the fire for the period of restoration." Wilson stated that he based his business-interruption figure entirely on documents provided by Cedar Hill.

Finally, Hannover presented the testimony of insurance industry expert witness Lewis Christ and underwriter Phillip Kelling. Christ testified that, in light of the information Hannover had received regarding the case, Hannover's actions were neither vexatious nor in breach of the insurance contract. He also testified generally that information such as the existence of mortgages is material and bears on underwriting decisions to insure risks and set premiums. Kelling testified that the undisclosed Rockwood Bank mortgage was material and claimed ARA would not have issued the policy had it been aware of the fact that Cedar Hill had concealed the existence of a second mortgage. Christ's general description of materiality within the industry buttressed Kelling's specific testimony regarding ARA's underwriting practices.

At the close of its case, Hannover made an offer of proof, like Cedar Hill's offer of proof, consisting of a long list of witnesses Hannover desired to present or to question at greater length. Hannover described in general terms the topics to be addressed by, and purpose for calling, each witness. In addition, Cedar Hill renewed its objection to the time limits and made an additional offer of proof, listing additional witnesses it claimed it would have used to rebut Hannover's case. After the parties made these offers of proof, the district court stated:

> All right. All right. Record will reflect the offer of proof made by the
> plaintiff and the defendant in this case is purely as an aside. The Court

-15-

would note that we are at 33 days of testimony and what does this make, this is, day 34 – how many actual weeks? We're on week 11 and the Court, having heard the witnesses that would be called and so forth would have been recalled reiterates we had plenty of time and plenty of effort and plenty of time to rehash all this but I have no doubt that I made the right decision as far as cutting down on the time is concerned.

When the parties and court addressed the issue of jury instructions for the second phase of the trial, Cedar Hill objected to two proposed instructions that it now challenges on appeal, proposed Instructions 12 and 18. Instruction 12, as submitted to the jury, was as follows:

> Your verdict must be for defendant on its counterclaim, and for defendant on plaintiff's claim for breach of the insurance contract, if you find any one or more of the following:
>
> First, that plaintiff intentionally concealed from or misrepresented to defendant any material fact or circumstance concerning the claim or insurance, the existence of a mortgage, the condition, value, existence, purchase price or age of any of the subject contents, or the value of the subject building . . . .

Cedar Hill argued this instruction was erroneous because it did not require Hannover to prove all the elements of fraud or all the elements required by Missouri law to void an insurance contract. The district court rejected Cedar Hill's argument and submitted the instruction. The court also submitted an interrogatory to the jury based upon this instruction. Interrogatory 12 provided as follows:

> Do you find that plaintiff intentionally concealed or misrepresented to defendant any material fact or circumstance concerning the claim or insurance, the existence of a mortgage, the condition, value, existence, purchase price or age of any of the subject contents, or the value of the subject building?

-16-

Instruction 18 addressed Cedar Hill's claim of vexatious refusal to pay and directed the jury to consider vexatious refusal to pay only if it first found for Cedar Hill on the issue of coverage, *i.e.*, found against Hannover on its defenses to coverage. Cedar Hill objected to Instruction 18 on the sole ground that Instruction 18 did not describe vexatiousness. Specifically, Cedar Hill stated to the district court, "while plaintiff accepts Instruction 18, we think there should be additional instructions defining what the jury should consider as vexatious conduct." Cedar Hill later stated, "we think the instruction's fine with the exception of a supplemental with respect to the elements of vexatious refusal." Cedar Hill did not object to Instruction 18 on the basis that it required a finding of coverage before there could be a finding of vexatiousness.

The jury returned a verdict against Cedar Hill and in favor of Hannover on Cedar Hill's claims of vexatious refusal to pay and breach of contract. The jury returned a verdict in favor of Hannover and against Cedar Hill on the misrepresentation claim, answering the interrogatory accompanying Instruction 12 in the affirmative and finding no coverage. The court specifically instructed the jury as to damages, and Hannover argued it was entitled to at least the sums paid to Cedar Hill and the Roses. The jury awarded Hannover zero dollars in damages.

F. Post-Trial Motions

Following the trial, Hannover moved for restitution from Cedar Hill for the sums advanced to Cedar Hill and paid to the Roses. Cedar Hill contested the motion and filed its own motion for relief on numerous grounds. Cedar Hill complained of the district court's liberal admission of testimony and the strict time limits imposed in the second phase. Cedar Hill also argued that newly discovered testimony from an underwriter in a different case purportedly proved that mortgages were not material to underwriting decisions. Cedar Hill argued Hannover failed to make this in-formation available prior to trial when Cedar Hill had asked Hannover to designate

-17-

a corporate witness in accordance with Federal Rule of Civil Procedure 30(b)(6). The district court denied Cedar Hill's motion for relief and granted Hannover's motion for restitution, ordering Cedar Hill to repay Hannover for the sums Hannover had paid to the Roses and advanced to Cedar Hill.

II. Discussion

A. Waiver

Cedar Hill argues Hannover waived its defense to coverage regarding Cedar Hill's misrepresentations about the Rockwood Bank mortgage. According to Cedar Hill, Hannover knew or was on notice of Rockwood Bank's mortgage because Rockwood Bank received numerous certificates of insurance between 1999 and 2002, Rockwood Bank was a loss payee on the 1998 Vesta policy, and Cedar Hill listed Rockwood Bank on the one-page, April 2003, sworn proof of loss. Cedar Hill argues that because Hannover knew of the Rockwood Bank mortgage but did not specifically allege misrepresentations or concealment as to this issue as a basis for denying coverage prior to litigation or in its initial declaratory-judgment complaint, Hannover should be precluded from arguing any such misrepresentations as defenses to coverage.

Neither Missouri law nor the facts support Cedar Hill's position. Prior to 1989, Missouri cases contained conflicting statements regarding the elements of waiver and estoppel and the applicability of each in the context of insurers' defenses to coverage. In <u>Brown v. State Farm Mut. Auto. Ins. Co.</u>, 776 S.W.2d 384, 386–88 (Mo. 1989) (en banc), however, the Missouri Supreme Court provided an exhaustive review of the state's cases and clarified these subjects. After <u>Brown</u>, waiver is a disfavored doctrine for precluding an insurer's defense, and estoppel is the preferred doctrine. <u>Id.</u> at 388. Waiver still applies in limited circumstances, but only where there has been "either (1) an express waiver by the insurer or (2) conduct which clearly and unequivocally

-18-

shows a purpose by the insurer to relinquish a contractual right." Id.; see also Shahan v. Shahan, 988 S.W.2d 529, 534 (Mo. 1999) (en banc). In the absence of one of these circumstances, an insured must rely on estoppel, which requires more than a showing that an insurer failed to raise a defense. Estoppel applies only where an insurer raised inconsistent defenses and, by raising inconsistent defenses, caused prejudice to the insured. Brown, 776 S.W.2d at 388 ("[T]he insurer must first announce a specific defense and subsequently seek to rely instead on an inconsistent theory."). Here, waiver is not applicable because Hannover did not expressly waive any defense and took no clear and unequivocal actions showing a purpose to relinquish a defense. Further, estoppel is not applicable because the mortgage-related misrepresentation defense is not inconsistent with any of the originally raised defenses.

Cedar Hill also argues that the policy language and Missouri statutes and regulations required Hannover to respond in a timely manner by accepting or denying the claim following delivery of the April 11, 2003 sworn proof of loss. Cedar Hill cites (1) policy language that required Hannover to accept or deny the claim within thirty days of receipt of the proof of loss and (2) Mo. Rev. Stat. § 375.1007 and corresponding regulations that Cedar Hill alleges required Hannover to notify Cedar Hill of its intentions within fifteen days of receipt of the proof of loss.

The facts demonstrate that these arguments are without merit. Cedar Hill did not support its proof of loss with any of the requested documentation or a detailed itemization of items lost, as required by the policy and as specifically requested by Hannover. As such, Cedar Hill makes a factually unfounded claim when asserting that it completed the disclosures necessary to trigger a statutory or regulatory deadline for Hannover to accept or deny the claim. Hannover repeatedly sought additional information from Cedar Hill following April 11, 2003, and prior to initiating the declaratory-judgment action. The declaratory-judgment action, alleging, *inter alia*, a failure to cooperate, was an attempt to obtain judicial resolution of the very question Cedar Hill alleges Hannover failed to answer, namely, whether the claim was to be

-19-

accepted or denied. Even after litigation commenced, Hannover needed an order from the district court to obtain the documents it sought. Accordingly, we reject Cedar Hill's argument that Hannover should be precluded from presenting arguments not asserted within thirty days of April 11, 2003.

Finally, Cedar Hill is wrong to argue Hannover knew of the Rockwood Bank mortgage based on the several certificates the Wilkerson agency issued to Rockwood Bank as proof of Cedar Hill's insured status or based on the naming of Rockwood Bank as a lienholder in the 1998 Vesta policy. Listing a party as a loss payee on a proof of insurance document neither implies that the listed party is a mortgage holder nor gives rise to a duty on the part of the insured to inquire as to the nature of the loss payee's relationship to the insured. The purpose of the document, the testimony regarding the document, and the disclaimers on the face of the document simply make Cedar Hill's position untenable. The parties who demand proof of insurance are too numerous and varied to give rise to a duty on the part of an insurer to investigate each party's connections to an insured, especially in the context of an equipment-rental business.

As to the 1998 Vesta policy, Rockwood Bank was named as a lienholder, but not as a mortgage holder. Like several other lienholders listed on that policy, Rockwood Bank did not appear in subsequent information from Cedar Hill. Hannover and ARA, therefore, were not on notice as to Rockwood Bank's status as a mortgage holder in 1998 or Rockwood Bank's ongoing interest as a lienholder after that time. Further, because creditors come and go—especially creditors not disclosed as having liens on real property—Hannover and ARA were not on notice of Rockwood Bank's ongoing relationship with Cedar Hill. Hannover's defense is not barred by waiver or estoppel.

B.  Admission of Evidence

    i.  Lewis Christ

"Evidentiary rulings are reviewed for abuse of discretion giving due deference to the district judge who saw and heard the evidence." United States v. Two Elk, 536 F.3d 890, 900 (8th Cir. 2008) (internal quotations omitted).  "'A district court by definition abuses its discretion when it makes an error of law.'" Id. (quoting Koon v. United States, 518 U.S. 81, 100 (1996)).  Similarly, we review the admissibility of expert testimony for abuse of discretion.  Allen v. Brown Clinic, P.L.L.P., 531 F.3d 568, 573 (8th Cir. 2008).

Cedar Hill presents several arguments against the admissibility of Christ's testimony, including a challenge under Daubert,[6] a challenge characterizing Christ's opinions as inadmissible statements of law, and a challenge to Christ's testimony as lacking foundation.  Christ testified generally as to underwriting standards, the materiality of mortgage information on underwriting decisions, and proper claims handling.  He also offered opinions specifically as to the materiality of Cedar Hill's failure to disclose the Rockwood Bank mortgage and Hannover's handling of Cedar Hill's claim.

We reject all of Cedar Hill's arguments.  Regarding Daubert, Christ had exhaustive experience in the insurance industry and had served as the Director of Insurance for the State of Missouri.  Clearly Christ was "qualified as an expert by knowledge, skill, experience, training, or education" who held "specialized knowledge" that could "assist the trier of fact to understand the evidence or to determine a fact issue."  Fed. R. Evid. 702.  Regarding underwriting standards, Christ's testimony was relevant to provide industry-standard context for Kelling's

---

[6]Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

company-specific testimony about underwriting. Regarding Christ's testimony as to non-vexatiousness and Brad Burgan's responsibility for the fire, Cedar Hill insists on characterizing this evidence as an attempt to "retry" the arson phase and poison the jury against Cedar Hill. In actuality, however, this evidence was relevant to show that, based on the information Hannover had received about the fire, the Burgans, and Cedar Hill, Hannover acted reasonably and within normal industry practice by suspecting arson and asserting its contractual defenses. The fighting issue on the claim of vexatious refusal to pay was the state of mind of the insurer and its actions in light of the information it had received. Bouligny v. Metro. Life Ins. Co., 179 S.W.2d 109, 112 (Mo. Ct. App. 1944) ("[I]f the case is one where the information in the company's possession at the time it is called upon to pay is such as to raise a fair doubt about its liability, then it is not to be charged with bad faith in demanding a judicial determination of the matter, and in such a situation its refusal to pay is not vexatious within the meaning of the statute."). Industry-wide practices are relevant to the question of whether an insurer acts within acceptable boundaries based on information it has received in a given case.

### ii. Hearsay, Gossip, Rumor, and Innuendo

Although Cedar Hill characterizes the evidence of Brad Burgan's actions as "gossip, rumor, and innuendo," the evidence was properly admitted. The evidence admitted in phase two, over Cedar Hill's objection, largely amounted to reports by investigators of the bases for their opinions. To the extent the investigators reported what witnesses, neighbors, former employees, and investigators of prior fires had told them, the reports may have been hearsay if offered for the truth of the matter asserted. In the second phase of the trial, however, this evidence was not offered to prove that any prior statements were true. They were offered to show the information Hannover had received and relied upon in investigating the claim and initiating the declaratory judgment action. See Goodman v. State Farm Ins. Co., 710 S.W.2d 423, 424 (Mo. Ct. App. 1986) ("[T]estimony of the defendant's investigator concerning statements made

-22-

to him by neighbors . . . was properly admitted. It was offered not for its truth, but to establish the information in the possession of the defendant when it denied plaintiffs' claim. As such it was relevant to the vexatious refusal to pay allegations injected into the lawsuit by plaintiffs' petition."); Goffstein v. State Farm Fire and Cas. Co., 764 F.2d 522, 525 (8th Cir. 1985) (applying Missouri law in a case involving a police investigation but no criminal charges, and holding, "Defendant was entitled to introduce evidence to refute [a vexatious refusal to pay] claim, including information from the police department that the fire had been intentionally set.").

We note further that, as with the time limitations discussed below, the district court was fully entitled to exercise its broad discretion in its management of evidence and testimony in the second phase of this trial. The second phase did not occur in a vacuum. Rather, the district court was attempting to expedite the second phase following a protracted first phase during which conduct by the attorneys frustrated efficiency, frustrated the court, and demanded an enormous contribution of time from the jurors. In this context, the district court did not abuse its discretion by granting Hannover's witnesses broad license to describe the bases for their views and to show the jury what information Hannover relied upon in handling the case.

### iii. Phillip Kelling

As noted above, Cedar Hill moved to exclude all evidence of underwriting standards in light of the fact that Richard Peterson, Hannover's Rule 30(b)(6) designated corporate representative, proved unknowledgeable as to this facet of Cedar Hill's multi-faceted demand for designation. Cedar Hill correctly notes that exclusion of testimony as to designated topics may be an appropriate sanction for a corporation's inadequate designation. Fed. R. Civ. Pro. 37(b)(2) (2006) (stating that if a party's Rule 30(b)(6) designee "fails to obey an order to provide or permit discovery . . . the court . . . *may make such orders in regard to the failure as are just . . .* [including] . . . (B) prohibiting [the disobedient] party from . . . introducing designated matters in

evidence.") (emphasis added).  Exclusion is not necessarily required, however, and here we find no abuse of discretion in the district court's refusal to exclude such testimony.  Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208, 1213 (8th Cir. 1981) (standard of review).

Cedar Hill argues "Rule [30(b)(6)] aims to prevent a corporate defendant from thwarting inquiries during discovery, then staging an ambush during a later phase of the case."  Rainey v. Am. Forest & Paper Ass'n, 26 F. Supp. 2d 82, 95 (D.D.C. 1998).  While it is true that exclusion of testimony on designated topics can ensure such "ambushes" do not take place, the present record does not support Cedar Hill's characterization of Hannover's actions as concealment followed by an "ambush" at trial.  Cedar Hill elected to forgo the pursuit of several avenues of information openly disclosed by Hannover.  Cedar Hill deposed Peterson months before filing its motion in limine, and Peterson stated in his deposition that an ARA representative would be able to answer Cedar Hill's questions.  Cedar Hill had previously received a report from Kelling addressing underwriting issues, and Hannover had disclosed another person at ARA with knowledge of these issues, Cindy Prowell. On these facts, and in the context of parties' actions throughout discovery and trial, the district court did not abuse its considerable discretion in denying Cedar Hill's motion to exclude evidence of underwriting standards.

C.  Intentional Misrepresentation: Instruction 12 & Sufficiency of the Evidence

Cedar Hill challenges Instruction 12 and argues the evidence was insufficient to support the jury's verdict.  Cedar Hill characterizes its arguments surrounding Instruction 12 and the jury's findings on the related interrogatories in several different ways.[7]  The questions we must address, however, boil down to whether the in-

_____

[7]Cedar Hill raises several arguments concerning characterization of the 1999 Acord and ARA applications as warranties and characterization of the jury's verdict

struction was erroneous and whether the evidence was sufficient to support the jury's verdicts.

"In diversity cases the substance of jury instructions is a matter governed by the applicable state law." Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 711 (8th Cir. 2001) (internal quotation omitted). Jury instructions need not be a model of clarity, but must, "when read as a whole, . . . fairly and adequately present the relevant state law." Id. Finally, we will not reverse a jury verdict for insufficient evidence unless we determine the evidence, taken in a light most favorable to the verdict, is such that no reasonable jury could have reached that verdict. Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1009 (8th Cir. 2008), cert. denied, 129 S. Ct. 1000 (2009).

"Under Missouri law, an insurance company may avoid a policy by showing that a representation is both false and material when: (1) the representation is warranted to be true, (2) the policy is conditioned upon its truth, (3) the policy provides that its falsity will avoid the policy, *or* (4) the application is incorporated into and attached to the policy." Shirkey v. Guarantee Trust Life & Ins. Co., 141 S.W.3d 62, 67 (Mo. Ct. App. 2004) (quotation omitted) (emphasis added). Shirkey also states, in the further alternative, that an insurer may void a policy if the insured has committed common-law fraud. Id. Here, the relevant policy language was as follows:

---

as a finding that misrepresentations regarding mortgages are material as a matter of law. We elect not to address these arguments in detail because the district court neither instructed the jury as to warranties nor instructed the jury that any representations in the case were material as a matter of law. Although the district court allowed the expert witnesses for both parties to make various claims about insurance law in general and Missouri law in particular, these statements prejudiced neither party in light of the instructions discussed herein.

-25-

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

    1. This Coverage Part;
    2. The Covered Property;
    3. Your interest in the Covered Property; or
    4. A claim under this Coverage Part.

Accordingly, the express terms of the present policy provided that the insurer may void the policy in the event of a false and material intentional representation as to any one of the four listed topics. Instruction 12 and the interrogatory accompanying Instruction 12 mirrored this policy language with the exception that Instruction 12 did not use the policy language "your interest in the Covered Property," but rather, used the term "mortgage." This slight alteration is unobjectionable because the existence of a mortgage necessarily is a fact concerning the property owner's "interest in the Covered Property."

Cedar Hill insists that Shirkey does not provide alternative bases for voiding a policy, but rather, requires a showing of common-law fraud in all instances before an insurer may void a policy, including an intent to deceive and reliance. Cedar Hill also argues that the district court improperly treated the earlier insurance application submitted to Safeco as a "warranty" and instructed the jury that misrepresentations or concealed information about a mortgage were material as a matter of law. We disagree.

Regarding materiality, the district court charged the jury with finding for the insurer only if it found a "material" misrepresentation. As a result, the court through Instruction 12 did not instruct the jury that statements about mortgages were warranties or were material as a matter of law. Rather, the court charged the jury with the task of determining whether any intentional misrepresentations were material.

-26-

Although the instruction presumed the existence of a mortgage to be a fact concerning "your interest in the Covered Property," the instruction clearly left to the jury the question of materiality. This straightforward reading of Instruction 12 also defeats the warranty argument since the jury was free to hold that nothing the insured said or failed to say rose to the level of a material misrepresentation or omission.

Regarding the need to instruct as to fraud beyond what is included in Instruction 12, we have held that an instruction essentially the same as Instruction 12 was a proper application of Missouri insurance law. See United Fire and Cas. Co. v. Historic Pres. Trust, 265 F.3d 722, 731 (8th Cir. 2001) (applying Missouri law). The policy in the present case contains language identical to the language at issue in United Fire. The instruction our court approved in United Fire stated:

> Your verdict must be for [insurer] on [insured's] claim for insurance benefits and interest as a result of the fire of September 7, 1997, if you believe:
> First, that [the insured] represented [at least one of several assertions]; and
> Second, that any one or more of the representations in paragraph First were false; and
> Third, [insured] knew that it was false or did not know whether it was true or false; and
> Fourth, the representation was material; and
> Fifth, [insured] intended to deceive [insurer].

Id.

In United Fire, the insurer who sought to defeat coverage argued that the policy language at issue in that case, "intentionally . . . misrepresent," differed from the instruction that required the jury to find a false and material representation made with the "intent to deceive." Id. There, we stated, "to intentionally misrepresent a fact is to make a false statement with the intent to deceive the hearer. One cannot intentionally misrepresent by mistake, because such a statement would necessarily be

unintentional." Id. (internal quotations omitted). United Fire, then, is an application of Missouri law to policy language identical to that in the present case with an instruction that is essentially indistinguishable from the instruction in the present case. Instruction 12 conditioned liability on the jury's finding of an intentional misrepresentation or concealment of a material fact as to enumerated topics. Under United Fire, such a finding is sufficient for liability. Cedar Hill's argument that it was error to submit Instruction 12 is without merit as it is inconsistent with Shirkey and United Fire.

Here, the evidence was sufficient to support the jury's finding of an intentional and material misrepresentation. The 1998 Vesta policy listed Rockwood Bank as a loss payee but not as a mortgagee. In the 1999 Acord and ARA applications, Cedar Hill and its agent listed neither mortgagee. ARA, as the underwriter, relied upon the 1999 applications and policy when it requested "updated" information from Cedar Hill in subsequent years. The Wilkerson agency, acting as Cedar Hill's agent, sent notices to add the Roses to the policies as mortgagees in several years, but in each instance, it failed to add Rockwood Bank as a mortgagee. The jury was free to view the disclosure of partial information as tantamount to an intentional concealment of the information not disclosed. Osterberger v. Hites Constr. Co., 599 S.W.2d 221, 227 (Mo. Ct. App. 1980) ("[W]e have found that partial information may be as misleading and deceptive as active misrepresentation, and we have imposed a duty to disclose material facts where the defendant has invited plaintiff's confidence by making only a partial disclosure."). In addition, Cedar Hill and the Wilkerson agency failed to list the Rockwood Bank mortgage in response to ARA's request for updated information in 2002, and they failed to disclose the Rockwood Bank mortgage when disclosing the Roses' mortgage in November 2002.

When Cedar Hill repeatedly updated its mortgage information with only partial information and accepted, without comment, policies that failed to list Rockwood Bank, the insurer was entitled to presume it had received complete information. The

-28-

jury was entitled to find that these repeated partial disclosures were intentional misrepresentations regarding Cedar Hill's interest in the insured property. Weekly v. Mo. Prop. Ins. Placement Facility, 538 S.W.2d 375, 379 (Mo. Ct. App. 1976) ("Where the answers in the application are complete on their face, the insurer is not obliged to make further inquiry . . . ."). Because we must draw all reasonable inferences in favor of the jury's verdict, we must presume the jury viewed the specific and repeated disclosure of one but not both mortgages as an intentional omission. Osterberger, 599 S.W.2d at 225 (stating that, when "no findings of fact or conclusions of law were requested or given, all issues are to be deemed found in accordance with results reached" by a judgment).

Cedar Hill also argues that Hannover had actual knowledge of the omitted mortgage because Nichols, Cedar Hill's agent, provided a "certificate of insurance" that listed the omitted mortgage holder and provided a copy of the 1998 Vesta policy that listed Rockwood Bank as a loss payee. As discussed above in reference to Cedar Hill's waiver argument, certificates of insurance issued to a third party convey information to that third party, but in no way alter the relationship between the insurer and the insured. They also do not provide notice to the insurer of the third party's relationship with the insured. In short, nothing relayed in the earlier insurance policy, application, or certificates put Hannover on notice of a need to investigate the relationship between Cedar Hill and Rockwood Bank.

Hannover was also required to prove that these misrepresentations or omissions were material. "A fact material to the risk within the meaning of the word 'material' . . . is one which, if communicated to the insurer, would cause refusal to insure, or, if accepted and policy issued, the rate would be higher." Bearden v. Countryside Cas. Co., 352 S.W.2d 701, 707 (Mo. Ct. App. 1961) (internal quotations omitted). On this issue, the combined testimony of Kelling and Christ established materiality. Cedar Hill points out that Kelling waffled as to the issue of materiality. Ultimately, however, he testified that ARA would not have issued the Hannover policy had it been

aware of Cedar Hill's concealment of a second mortgage. Christ testified generally as to industry practice and confirmed Kelling's assertion. See Meeker v. Shelter Mut. Ins. Co., 766 S.W.2d 733, 740 (Mo. Ct. App. 1989) ("Industry custom and practice [are] relevant to the issue of whether misrepresentations in an application for insurance are material."). Christ's testimony was consistent with the explanations provided in several Missouri cases as to why mortgage information is material in the context of underwriting risk. Essentially, when an insured is highly leveraged, stands to profit from an insured loss, or does not stand to lose a substantial interest in the property, there exists an increased risk that the insured will fail to protect the property from loss or may act to cause a loss. See Bearden, 352 S.W.2d at 707 ("Representations regarding mortgages on the insured property are material as a matter of law.").[8]

Cedar Hill argues that the omission or misrepresentation was not material because the applications and supplemental information request did not ask specifically for the amount of any mortgages. This argument is not wholly without merit. The amount of debt associated with outstanding mortgages, rather than the number of such mortgages, would seem to provide a more detailed picture of the extent of an insured's interest in the insured property, and, therefore, the insured's ability and incentive to protect the insured property from loss and maintain the integrity and safety of the property.

This argument ultimately fails, however, because information requests need not be comprehensive in order for information to be deemed material. Applications and information obtained from potential insureds may, out of practicality, be limited in scope. Underwriters may strike a balance between gathering endless volumes of detailed information, on the one hand, and limiting initial information requests so as

---

[8]We emphasize that the district court did not instruct the present jury that mortgage information is material as a matter of law, and as such, we do not base our holding on this theory.

to be accessible and easy to work with, on the other. As such, insurers and underwriters are entitled to rely upon the responses and information provided by potential insureds and to presume the insured has provided responses that are true and complete. Prudential Prop. and Cas. Ins. Co. v. Cole, 586 S.W.2d 433, 436 (Mo. Ct. App. 1979). As explained by Kelling, each question posed need not be comprehensive because certain responses may give rise to a need to inquire further as to any given topic. Kelling testified as to the materiality of the concealed second mortgage as follows:

> First of all, why would they be hiding that factor? You know, that would be my first question. But typically you look at that and you say, well, why – you know, how extended are they? You know, are they under water here, can they support their business? Typically it's a bad sign. And so more questions have to be asked. And then we seriously have to consider would we insure this person or not.

The disclosure of multiple mortgages puts an insurer or underwriter on notice of the possible need to further investigate the financial strength of a potential insured. It is relevant to both the moral hazard that the potential insured might not maintain and protect the insured property and to the simple risk that the potential insured will not be able to pay premiums as they come due. Here the undisclosed mortgage, if it had been disclosed and investigated, would have revealed that Cedar Hill's encumbrances were substantial relative to the value of the property.

Our conclusion that the evidence supports a finding of a material misrepresentation regarding Cedar Hill's interest in the property does not end our inquiry. Instruction 12 and the interrogatory accompanying Instruction 12 permitted the jury to find misrepresentations as to Cedar Hill's mortgages or as to "the claim or insurance, . . ., the condition, value, existence, purchase price or age of any of the subject contents, or the value of the subject building." The instruction and interrogatory listed the subjects of the misrepresentations in the disjunctive, and as

such, we cannot be sure which misrepresentation the jury found—misrepresentations regarding the undisclosed mortgage or misrepresentations regarding the claim (which in the present case incorporates the questions of "the condition, value, existence, purchase price or age of any of the subject contents, or the value of the subject building"). Accordingly, we must address both possible bases for the jury's conclusion. Wolk v. Churchill, 696 F.2d 621, 624 (8th Cir. 1982) ("Because these misrepresentations were listed in the disjunctive, an error on any one of them is grounds for a new trial to the extent that the jury might have based its finding of fraud liability and damages on such error.").

Taken in a light most favorable to the verdict, Hannover presented ample evidence that Cedar Hill's sworn statement of loss seeking $1.74 million was a material and intentional misrepresentation or omission substantially overstating the value of the claim. The total amount Cedar Hill sought far exceeded the value of the building and its contents and any loss of business. Hannover's forensic accountant, Wilson, testified in detail as to the documentation Cedar Hill produced regarding losses caused by the fire. Wilson was adequately qualified to offer accounting testimony, he explained the bases for his opinions, and Cedar Hill cross-examined Wilson regarding the bases for his opinions. Although the district court's time limits prevented more extensive cross-examination of Wilson, Cedar Hill has not explained specifically what additional cross-examination would have accomplished as to the vast majority of his conclusions. In short, the jury was entitled to accept Wilson's testimony and find a misrepresentation as to the claim rather than, or in addition to, a misrepresentation about the mortgage.

Finally, Cedar Hill argues that Missouri's Valued Policy Statute, Mo. Rev. Stat. § 379.140, prevents Hannover from contesting the value of the insured property. Under Cedar Hill's interpretation of the statute, if the loss were a total loss, Hannover would be required to pay the policy limits without proof or documentation from Cedar Hill regardless of depreciation and regardless of whether Cedar Hill chose to rebuild

and restock its building. On the present facts, we need not address the details of Missouri's statute or Cedar Hill's interpretation of that statute. Even if Cedar Hill's interpretation of the duties imposed by the Valued Policy Statute were correct, nothing in the Valued Policy Statute would preclude an insurer from presenting a defense based on alleged misrepresentations. See DeWitt v. Am. Family Mut. Ins. Co., 667 S.W.2d 700, 708 (Mo. 1984) (en banc) ("*Absent fraud, misrepresentation or collusion*, the valuation in the policy is conclusive upon the parties.") (emphasis added).

Further, our court has already determined that neither Mo. Rev. Stat. § 379.140 nor any other Missouri statute dealing with value-policy determinations apply to business-interruption losses. Polytech, Inc. v. Affiliated FM Ins. Co., 21 F.3d 271, 273–76 (8th Cir. 1994). Cedar Hill eventually revealed that its claim for $1.74 million included a claim for over $300,000 in business-interruption losses. Wilson, reviewing records made available by Cedar Hill, determined Cedar Hill's business interruption losses to be, at most, $66,500. Cedar Hill's claim was not slightly off from this figure, but rather it was four to five times the amount supported by documentation. Viewing the evidence in a light most favorable to the verdict, we must presume the jury found Wilson credible and accepted his testimony. Because the jury was free to conclude that this dramatic overstatement of losses comprised a policy-voiding, intentional misrepresentation, and because the Valued Policy Statute does not apply to this aspect of damages, we must reject Cedar Hill's attempt to shield itself with the statute.

D. Vexatious Refusal and Instruction 18

Cedar Hill also argues Instruction 18 regarding vexatious refusal to pay was erroneous in that Instruction 18 only permitted the jury to consider the possibility of a vexatious refusal to pay if the jury first rejected the insurer's arguments and found that coverage existed. Cedar Hill did not raise this objection below. Cedar Hill did offer additional language to be used in Instruction 18, but the district court rejected

that additional language. Cedar Hill's suggested language further defined the term "vexatiousness" but did not contradict that portion of Instruction 18 permitting the jury to find a vexatious refusal to pay only if it first rejected the insurer's various arguments against coverage. In fact, Cedar Hill stated, "[W]e think the instruction's fine with the exception of a supplemental with respect to the elements of vexatious refusal." Because Cedar Hill did not raise this challenge to Instruction 18 below, we review only for plain error, affirming unless there is an error that is plain, affects Cedar Hills substantial rights, and "seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732–36 (1993) (internal quotation and alteration omitted); United States v. Pirani, 406 F.3d 543, 550 (8th Cir. 2005).

We were unable to locate any Missouri cases in which an award based on a vexatious refusal pay was unaccompanied by an underlying finding of coverage. As such, we find no error. That having been said, there is strong dicta in Missouri cases stating that an insurer's tactics, in litigation or otherwise, could be so reprehensible as to rise to the level of a vexatious refusal to pay, even though the insurer is pressing a valid defense. For example, in DeWitt, 667 S.W.2d at 710, the Missouri Supreme Court stated, "The existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." Id. The court in DeWitt ultimately found against the insurer on its defenses and determined coverage existed. Id. at 708. Accordingly, even though the quoted language is forceful, it remains dicta to the extent Cedar Hill seeks its application in the present case where the jury found no coverage.

Further, we note that Missouri's vexatious refusal to pay statute, on its face, permits damages and attorneys fees as possible awards "*in addition to* the amount [of the insurance claim] and interest." Mo. Rev. Stat. § 375.420 (emphasis added). It would seem, then, that the governing statute itself presumes an underlying finding of coverage. Given that the support for Cedar Hill's position is found only in dicta, we

-34-

cannot say the use of Instruction 18 amounted to an error that was "clear." See Olano, 507 U.S. at 734 ("[C]ourt of appeals cannot correct an error pursuant to [plain error review] unless the error is clear under current law."); see also United States v. Bennett, 469 F.3d 46, 50 (1st Cir. 2006) (finding no plain error where the court had not previously addressed the issue and other circuit courts were split); United States v. Jones, 108 F.3d 668, 671–72 (6th Cir. 1997) (assuming the district court erred, but determining the error was not plain because there was "only sparse case law addressing" the issue and it was "divergent and conflicting").

Even if the first two steps of the plain error test were satisfied, relief would remain unavailable in the absence of prejudice to Cedar Hill and detriment to the integrity and reputation of the judicial system. Pirani, 406 F.3d at 550. As a practical matter, then, even though it is conceivable that an insurer could ultimately prevail in showing that there is no coverage but, in the process, use tactics so reprehensible as to rise to the level of vexatiousness, the current record would not support such a finding. Hannover pressed valid defenses (the misrepresentation defense successfully and the arson defense unsuccessfully), pressed no frivolous defenses, and defeated a claim of breach of contract. While we do not commend Hannover on the way it conducted itself during discovery or at trial, we recognize that Hannover was no more culpable for the pace or contentiousness of these proceedings than was Cedar Hill.

E. Time Limits

We review a district court's trial management rulings, such as the imposition of time limits, for abuse of discretion. Harris v. Chand, 506 F.3d 1135, 1141 (8th Cir. 2007). "Trial courts are permitted to impose reasonable time limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence." Life Plus Int'l v. Brown, 317 F.3d 799, 807 (8th Cir. 2003). "When there is an objection to the exclusion of evidence as a result

of time limits, the record must show a proper basis or explanation by the district court for the exclusion." Harris, 506 F.3d at 1141.

Here, Cedar Hill repeatedly objected to the second-phase time limits. At the end of its second-phase case, Cedar Hill listed several witnesses it would have presented or examined further but for the time limits. According to Cedar Hill, these witnesses would have testified as to the vexatious nature of Hannover's conduct. In addition, at the end of Hannover's case, Cedar Hill listed at least nine witnesses it desired to present in rebuttal. Cedar Hill stated, among other matters, it would have recalled Brad Burgan to talk about prior house fires; a witness to talk more about damages; a banker from Rockwood Bank to talk about certificates of insurance; a witness to talk about cooperation with the insurance company's investigation; Nichols to talk about his opinion regarding whether Hannover should have known of Rockwood Bank; and Denise Burgan to testify that she had no intent to conceal the Rockwood Bank mortgage.

In assessing the reasonableness of the time limits and whether the district court abused its discretion, we cannot view the time limits and the proposed witnesses in isolation. Rather, we must assess the district court's trial management decisions in context, against the backdrop of a twenty-nine day, first-phase trial and against the pattern of cumulative witnesses already called by the parties. Inefficient is a kind description of the attorneys' presentation of their first-phase cases. The district court was well aware of this fact, as shown by its comments. The district court was appropriately concerned at the length of time already spent on this matter, and the witnesses suggested by Cedar Hill largely appeared to be cumulative.

Cedar Hill sought to further pursue its theory that certificates of insurance served to place Hannover on notice that Cedar Hill's property interest was encumbered by a second mortgage to Rockwood Bank. The jury, however, heard ample description of the function of certificates of insurance during the lengthy trial.

The trial court did not abuse its discretion in determining any further testimony would have been cumulative.

Cedar Hill sought to further address issues of damages, although the jury was well aware of the scope of the damage caused by the fire, and although Cedar Hill offered no details to suggest how additional witnesses might bridge the substantial gap between the claim for damages and Hannover's accounting testimony. To the extent Cedar Hill sought to present damages testimony to advance its valued-policy argument, we have rejected the valued-policy argument on legal grounds, and additional testimony would not have furthered Cedar Hill's case.

To the extent Cedar Hill sought to present several additional witnesses regarding vexatious conduct by Hannover, we find Cedar Hill's arguments misplaced. Cedar Hill appears reluctant to accept the fact that the information received by Hannover during the investigation was relevant to the vexatiousness inquiry. The point of the trial on the claim of vexatiousness was not to prove or disprove the accuracy of the information received by Hannover, or to prove or disprove a claim of arson. It was to determine whether Hannover acted within industry standards or whether Hannover acted vexatiously based on that information. Had Hannover acted on scant information or solely on hearsay or unsupported suspicions, it would have been reasonable and arguably necessary to further explore the bases for Hannover's actions. Hannover, however, acted based on the conclusions and reports of official investigators, buttressed by suspicious circumstances and second-hand reports from several employees and other persons with vested interests in the ongoing viability of Cedar Hill. While it may be true that several more days of witness testimony might have placed Mr. Burgan in a better light, we fail to appreciate how any additional information or testimony could have made Hannover's approach to the situation seem vexatious. Simply put, Hannover received a great deal of information from several facially reliable sources that the fire may have involved foul play, and the second-

phase trial was not a trial to prove the accuracy of this information; it was a trial to prove the reasonableness of Hannover's reliance on this information.

Finally, the manner in which Cedar Hill made its offer of proof further illustrates that the district court did not abuse its discretion. Cedar Hill offered no specific information to suggest what proposed witnesses would have said. Cedar Hill stated generally what topics witnesses would have addressed and generally what witnesses it would have used to rebut particular issues. Cedar Hill did not, however, describe with specificity how additional testimony would have been more than cumulative in light of what the jury had already heard.

While we have looked with suspicion upon, and recommended caution regarding, strict time limits, we have not addressed a situation similar to the present case. See, e.g., Johnson v. Ashby, 808 F.2d 676, 678 (8th Cir. 1987) (stating that it may be an abuse of discretion to exclude "probative, noncumulative evidence" simply to avoid delay and that "limits should be sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive") (internal quotation omitted). Here, the district court imposed time limits late in the trial after gaining a clear picture of the attorneys' methods and habits in their use of time. Cedar Hill's offer of proof, if anything, showed that the court needed to impose limits to curtail the presentation of cumulative evidence and evidence as to issues that lacked merit. This is not a case like Harris, for example, where "[t]he district court imposed . . . rigid time constraints before the conclusion of discovery and six months before trial had begun." 506 F.3d at 1144 (J. Smith, dissenting). Rather, this is a case where the court imposed time limits late in the process in response to what it had observed over several weeks of trial. In this circumstance, we find no abuse of discretion.

F. Denial of Rule 60(b) Motion and Newly Discovered Evidence

We review the district court's rejection of Cedar Hill's post-trial Rule 60(b) motion for relief only for abuse of discretion. United States v. Metro. St. Louis Sewer Dist., 440 F.3d 930, 935 (8th Cir. 2006). Cedar Hill argued that newly discovered evidence proved Hannover had concealed information relevant to its underwriting standards and showed that the failure to disclose mortgage information was not material. The newly discovered evidence was testimony from a different third-party underwriter in a different case involving a different line of insurance from Hannover. See Ins. Corp. of Hannover v. Vantage Prop. Mgmt., L.L.C., No. 04-1012-CV-W-SOW, 2006 WL 2385138 (W.D. Mo. August 17, 2006) (unpublished). Seeking relief through Rule 60, Cedar Hill argued this evidence was "newly discovered" and with "due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2) (2006). Cedar Hill also argued that Hannover concealed this evidence as an act of "fraud . . ., misrepresentation, or . . . misconduct." Fed. R. Civ. P. 60(b)(3) (2006). We find both arguments unpersuasive and find no abuse of discretion in the district court's denial of Cedar Hill's motion.

Even if this information had been concealed as required under Rule 60(b)(3), and even if Cedar Hill could meet the diligence requirements of Rule 60(b)(2), the testimony Cedar Hill cites from depositions in the Vantage case is not as damning to Hannover as Cedar Hill claims. In that case, two employees of the third-party underwriter testified as to the issue of the materiality of mortgages for the purpose of accepting and pricing risk. One of the underwriters testified that mortgages were material because multiple mortgages may cause the underwriter to further investigate the potential insured's financial condition. The other testified that mortgage information was not relevant when quoting a risk, but was something to be addressed when binding a policy. Even taken in a light most favorable to Cedar Hill, these different underwriters in a different case dealing with a different line of insurance offered mixed opinions as to the materiality of mortgages. We view these mixed

opinions as, at most, potentially inconsistent impeachment evidence for use against Christ and Kelling. On these facts, the district court did not abuse its discretion in denying Cedar Hill's motion alleging fraudulent concealment. The absence of any abuse of discretion is particularly apparent in light of the fact that Hannover disclosed the names of relevant persons with knowledge as to underwriting, and Cedar Hill chose not to question those persons.

## G. Restitution

The district court determined, post-trial, that Cedar Hill was obligated to repay Hannover for the $50,000 Hannover advanced to Cedar Hill during the investigation and the $423,035.19 mortgage payoff from Hannover to the Roses. The court noted that there was no dispute as to the fact or amount of Hannover's payments. The court cited Federal Rule of Civil Procedure 50(a)(1) regarding judgment as a matter of law and stated that it found, "as a matter of law that no reasonable jury could find that defendant was not entitled to recoup the $473,035.19 defendant paid plaintiff and plaintiff's mortgagee." The court also noted its ability to grant "[f]urther necessary or proper relief based on a declaratory judgment . . . against any adverse party whose rights have been determined by such judgment" under the Declaratory Judgment Act. 28 U.S.C. § 2202. The record reflects that Hannover moved for judgment as a matter of law at the close of its case and that the district court denied the motion at that time. When Hannover moved for restitution or recoupment, it characterized the motion as a request for further relief under § 2202 and, alternatively, as a renewed motion for judgment as a matter of law. Hannover thus properly preserved its challenge for presentation after the jury rendered its verdict.

In contesting the award, Cedar Hill argues that determining damages is a function reserved uniquely for the jury and that an award of zero damages does not invalidate the verdict. Regarding the mortgage payment, Cedar Hill argues that, under Missouri law, an insured is not liable to an insurer for amounts the insurer pays to an

innocent mortgagee/additional insured. Cedar Hill presents no argument, other than the general sanctity of the jury's verdict, to explain why it would be entitled to retain the $50,000 advance under the void policy.

Regarding Cedar Hill's argument as to the sanctity of the jury's verdict, we are not persuaded. This is not a case in which the jury was required to resolve factual questions as to the amount of damages or quantify some amorphous harm such as physical injury or loss of prospective business opportunity. Rather, as noted by the district court, there were no disputes as to the fact or amount of Hannover's payments to Cedar Hill and the Roses. The court's imposition of restitution in the present case was the assessment of a sum certain to prevent unjust enrichment. This is unlike the jury's traditional role of resolving a factual dispute or quantifying a non-monetary harm, as described by Cedar Hill.

As noted, Cedar Hill advances no separate argument to justify its retention of the $50,000 advance. Regarding the mortgage payment, however, Cedar Hill argues that because the Roses were added to the policy as mortgagees and named insureds, Hannover had a separate contractual obligation to pay the Roses apart from any duty to provide coverage to Cedar Hill. Cedar Hill relies on several cases that stand for the proposition that the wrongful acts of a primary insured cannot defeat coverage owed by an insurer to an additional named insured. See Equal. Sav. and Loan Ass'n v. Mo. Prop. Ins. Placement Facility, 537 S.W.2d 440, 441 (Mo. Ct. App. 1976) ("[S]uch insurance is not invalidated by any act or neglect on the part of the mortgagor before, at the time of, or after the policy is issued. This has long been the rule in Missouri."); MFA Mut. Ins. Co. v. Huddleston, 459 S.W.2d 104, 108 (Mo. Ct. App. 1970).

These cases are a considered judgment of competing public-policy interests by Missouri courts: a named and innocent mortgage holder is entitled to payment even where the primary insured acts in a manner that voids the policy and precludes coverage for the primary insured. These cases do not, however, resolve the entirely

separate question of whether an insurer, having met its obligation to pay the innocent mortgagee, may recoup that payment from the primary insured whose actions voided the policy. It is this separate question that we must address.

Starting with the policy language at issue in the present case, we see that Hannover's payment of the mortgage transferred all rights under the mortgage from the Roses to Hannover. Section (F) of the insurance policy, entitled "Additional Conditions," provided:

1. Mortgageholders

> e. If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you failed to comply with the terms of this Coverage Part:
>
>> (1) The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and
>>
>> (2) The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.
>
> At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

Under the policy, then, Hannover "stepped into the shoes" of the Roses when it paid their mortgage balance and interest. Missouri's own courts recognize this transfer of rights. In <u>Huddleston</u>, the court stated that the rights an insurer obtained by paying off and acquiring a mortgage did not permit the insurer to sue the insured for the mortgage balance. <u>Huddleston</u>, 459 S.W.2d at 108-099. The insurer could only "proceed to foreclose under the mortgage security in the event of a default of the

-42-

mortgage." Id. In other words, the court in Huddleston viewed the insurer as stepping into the shoes of the mortgagee and receiving only those rights the mortgagee would have held, not some greater right of recoupment independent of foreclosure. In Auto-Owners Mutual Insurance Co. v. Newman, 851 S.W.2d 22, 26–27 (Mo. Ct. App. 1993), the procedure described in Huddleston played out. There, an insurer who paid an insured's mortgage under a voided policy brought a separate, deficiency-judgment action against the insured to recoup the payment to the mortgagee. The court described the insurer as the assignee of a deed of trust. Id.

Federal courts in Missouri have gone farther. In the context of declaratory judgment actions as to coverage, federal district courts have held culpable insureds liable for amounts the insurer paid to innocent mortgagees under voided policies. In Employer's Mutual Casualty Co. v. Tavernaro, 4 F. Supp. 2d 868, 869 (E.D. Mo. 1998), an insured admitted he intentionally set a fire that destroyed the insured property. The court granted summary judgment to the insurer, declaring the policy void and ordering the insured to pay restitution to the insurer for the amount the insurer had paid to an innocent mortgagee. Id. at 871. In Tavernaro, there was no mention of mortgage foreclosure or deficiency judgments; rather, the procedural context was a declaratory-judgment action. In Allstate Insurance Co. v. Estes, 118 F. Supp. 2d 968, 974 (E.D. Mo. 2000), the court interpreted Tavernaro, holding, "[U]nder Missouri law, when an insurer pays a mortgagee for loss from an insured's arson, the property insurer is entitled to recoupment and restitution of that amount from the insured." Id. We affirmed the finding of no coverage in Estes in an unpublished, per curiam opinion without comment as to the issue of restitution. Allstate Ins. Co. v. Estes, 16 F. App'x 534 (8th Cir. 2001) (unpublished).

Based on these cases, at a minimum, Missouri law entitled Hannover to step into the shoes of the mortgagee and seek any remedy available under the mortgage. The record is not developed as to the precise terms of the mortgage nor does it reflect whether Cedar Hill was current in its payments on the mortgage. Typically a

-43-

mortgage and note would permit acceleration and a demand for full payment upon destruction of the underlying property. We need not speculate, however, as to whether Missouri law and the present mortgage would have forced Hannover to pursue a deficiency judgment or foreclosure. Here, the district court fashioned its remedy under § 2202 of the Declaratory Judgment Act. We have previously recognized that "district courts have broad power under 28 U.S.C. § 2202 to craft damages awards in declaratory judgment actions to effectuate their judgment." BancInsure, Inc. v. BNC Nat'l Bank, N.A., 263 F.3d 766, 772 (8th Cir. 2001). The district court's decision to reduce the mortgage balance and cash advance to a judgment was an efficient means to fully resolve the matter before the court and effectuate the declaratory judgment.

We have carefully considered the additional arguments not expressly addressed in this opinion and find them to be without merit. The judgment of the district court is affirmed.

_____