# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-1854

_____

Captiva Lake Investments, LLC

*Plaintiff - Appellee*

v.

Fidelity National Title Insurance Company, successor-by-merger to Lawyers Title
Insurance Corporation

*Defendant - Appellant*

------------------------------

American Land Title Association; Missouri Land Title Association

*Amici on Behalf of Appellant(s)*

_____

No. 16-1923

_____

Captiva Lake Investments, LLC

*Plaintiff - Appellant*

v.

Fidelity National Title Insurance Company, successor-by-merger to Lawyers Title
Insurance Corporation

*Defendant - Appellee*

Appeals from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 5, 2017
Filed: February 28, 2018

_____

Before WOLLMAN and LOKEN, Circuit Judges, and ROSSITER, District Judge.[1]

_____

WOLLMAN, Circuit Judge.

National City Bank of the Midwest (National City) loaned Majestic Pointe Development Company, L.L.C. (Majestic Pointe), $21,280,000 in March 2006. Majestic Pointe planned to build a condominium development on the Lake of the Ozarks in Sunrise Beach, Missouri. To protect its security interest, National City purchased a title insurance policy (the policy) from Fidelity National Title Insurance Company (Fidelity).[2] Midway through construction, Majestic Pointe defaulted on the construction loan agreement and thereafter went bankrupt. National City sold its interest in the condominium development to Captiva Lake Investments, LLC (Captiva), which became the successor-in-interest under the policy.

Captiva filed a claim with Fidelity in August 2009, seeking coverage for mechanics' liens that had been filed against the property. Fidelity agreed to defend

_____

[1]The Honorable Robert F. Rossiter, Jr., United States District Judge for the District of Nebraska, sitting by designation.

[2]Lawyers Title Insurance Corporation issued the policy and later merged with Fidelity. We refer to the companies collectively as "Fidelity."

Captiva, subject to a reservation of Fidelity's rights under the policy, and hired attorneys to defend Captiva in the mechanics' lien litigation. Fidelity specifically reserved the right to deny coverage based on Exclusion 3(a), which excludes from coverage loss or damage that arose by reason of liens "created, suffered, assumed or agreed to by the insured claimant." Fidelity did not resolve the liens as quickly as Captiva would have liked, and so in August 2010, Captiva filed an additional claim under the policy's unmarketability-of-title provision, alleging that Fidelity had rendered the title unmarketable by failing to resolve or insure over the pending mechanics' lien claims.

Fidelity filed suit in federal district court in October 2010, seeking a declaration that the title insurance policy did not cover the mechanics' liens. Captiva filed counterclaims, which sought a declaration that the policy covered the mechanics' liens and which asserted claims against Fidelity for failing to diligently defend and resolve the mechanics' liens claims and for tortiously interfering with Captiva's relationship with the attorneys Fidelity had hired to defend Captiva. Before trial, Fidelity decided not to seek reimbursement from Captiva for the liens that it had resolved on Captiva's behalf. The parties thereafter stipulated to the dismissal of Fidelity's complaint and were realigned for trial, with Captiva as the plaintiff and Fidelity as the defendant.

The district court did not allow Fidelity to present its Exclusion 3(a) defense that National City "created, suffered, assumed or agreed to" the mechanics' liens. The court determined that evidence of intentional misconduct or inequitable dealings by National City was required to sustain the defense and that Fidelity had failed to present such evidence. The court dismissed the tortious interference claim. The jury found that Fidelity had breached the title insurance policy and, as is more fully discussed below, awarded more than $6 million in damages to Captiva.

We conclude that the district court did not apply the correct legal standard in deciding that Exclusion 3(a) did not apply to the mechanics' liens at issue in this case. Under the appropriate standard, Fidelity was entitled to present to the jury its defense that National City had "created, suffered, assumed or agreed to" the mechanics' liens. We further conclude that Captiva failed to show that the title was unmarketable on or before the effective date of the policy and thus failed to prove its claim that Fidelity breached the policy's unmarketability-of-title provision.

We affirm the district court's dismissal of the tortious interference claim. We vacate the judgment and remand the case for further proceedings. We also vacate the order awarding attorneys' fees and costs.

## I. Background

A construction loan provides funds for the construction of improvements on land. The developer and the lender enter into a construction loan agreement, which sets forth the terms of the loan and "generally incorporates by reference the project's plans and specifications, includes a budget that the developer must follow, and specifies the project completion date." 1 Grant S. Nelson et al., Real Estate Finance Law § 12.1 (6th ed.), Westlaw (database updated Dec. 2014). The developer's obligation to repay is set forth in a promissory note and the loan is secured by a mortgage or deed of trust, meaning that the loan is "secured by the construction project itself—the land and the building in progress." BB Syndication Servs., Inc. v. First Am. Title Ins. Co., 780 F.3d 825, 826-27 (7th Cir. 2015).

Construction lending can be risky. "If the construction project fails and puts the developer into bankruptcy, the lender's loan is protected only by the unfinished project, which is often worth far less than the money put into it." Id. at 827. Accordingly, construction lending requires careful underwriting and monitoring. Michael F. Jones & Rebecca R. Messall, Mechanic's Lien Title Insurance Coverage

for Construction Projects:  Lenders & Insurers Beware, 16 Real Est. L.J. 291, 292-93 (1988).  During underwriting, the lender will conduct a detailed analysis of the project to determine its risk.  Id. at 292.  Critical to the underwriting analysis is whether the construction loan, together with the developer's investment, provides sufficient funds to complete the project.  Id.  Many lenders require the developer to invest a substantial amount of its own money in the construction project.  Nelson et al., supra, at § 12.1.  If there is a shortfall in the loan amount compared with the estimated cost to complete the project, the lender often will require the developer to cover the difference before any loan funds are disbursed.  Jones & Messall, supra, at 293.  After the lender decides to issue the loan, it disburses loan funds incrementally as work is completed.

Incremental disbursement of loan proceeds allows the lender to monitor the construction project and ensure that the loan remains "in balance"—that is, that sufficient funds exist to complete the project.  Id.  After the developer requests a disbursement, the lender typically conducts a site inspection to ensure that the work has been completed.  See Nelson et al., supra, at § 12.1.  The lender also usually obtains lien waivers from the subcontractors that have been paid and then disburses funds, often holding back five to ten percent of the requested amount to be paid upon completion.  Id.  The construction loan agreement typically requires that the loan account remain in balance, that suppliers and subcontractors be paid promptly, that the project be constructed in accordance with the approved plans and specifications, and that the developer meet the approved timetable for completion.  Id.

In the event of default, the lender may cease making disbursements and may foreclose on the deed of trust.  Id.  "When the lender cuts off funding, there will always be some outstanding unpaid work; contractors request payment as work is completed, but there is inevitable delay from the time when work is completed to the time when bills are submitted."  BB Syndication Servs., 780 F.3d at 827.  The lender typically will look to its title insurer for indemnification.

Title insurance policies are important to construction lenders. Such policies typically provide that the insurer will indemnify the insured lender for loss or damage caused by defects in title or in lien priority that existed on the date of the policy, unless the defect is excluded from policy coverage. See Jones & Messall, supra, at 294-95. The lender pays only one premium, and the policy term continues as long as the insured can suffer loss from any defect that is covered by the policy and which existed at the time the policy went into effect. See BB Syndication Servs., 780 F.3d at 827. "This model works because title insurance is retrospective rather than prospective; it generally protects against defects in title that arose *prior to* the issuance of the policy, allowing the insurer to reduce or eliminate risk by conducting a careful title search to identify defects." Id.

The American Land Title Association (ALTA) writes title insurance policy forms that are used nationwide. The title insurance policy at issue in this case is a standard 1992 ALTA lender's title policy. Fidelity issued the policy after work on the condominium development had begun. Fidelity agreed to the lender's deletion of the standard policy language that excepted coverage for mechanics' liens. The policy thus covered the risk of loss resulting from mechanics' liens being given priority over the insured's deed of trust. This type of coverage is significant because Missouri gives priority to the mechanics' liens of unpaid contractors and suppliers, with the result that even if the deed of trust is recorded before any mechanics' liens, the mechanics' liens nonetheless will be deemed first in priority. See Mo. Rev. Stat. § 429.060. Fidelity also deleted the policy language that required the loan to be fully funded.

The policy insured "as of [the] Date of Policy . . . , against loss or damage . . . sustained or incurred by the insured by reason of:"

3.      Unmarketability of title; . . .

7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material.

## II. Exclusion 3(a)

Exclusion 3(a) excludes from coverage any loss or damage that arose by reason of:

3. Defects, liens, encumbrances, adverse claims or other matters: . . .

(a) created, suffered, assumed or agreed to by the insured claimant . . . .

Fidelity argues that Exclusion 3(a) of the policy excluded from coverage any loss or damage related to the liens that were filed against the Majestic Pointe development because National City "created, suffered, assumed or agreed to" the liens.

National City agreed to lend Majestic Pointe $21,280,000 pursuant to a construction loan agreement. As a condition to the loan opening, the agreement required that a title insurance policy be purchased in the full amount of the loan and with coverage for claims related to mechanics' liens. It further required that Majestic Pointe submit detailed plans and specifications, as well as a construction schedule that set forth the dates for commencement and completion of each phase of the project.

The construction loan agreement set forth a list of conditions precedent to disbursement of loan proceeds, including that the loan be in balance and that the lender be satisfied that the project budget remained accurate. To receive loan funds, Majestic Pointe was required to submit disbursement requests to National City.

-7-

Those requests were to be accompanied by a certificate of completion signed by the architect, lien waivers covering the work for which disbursement was to be made, and endorsements to the title insurance policy. No disbursements of loan proceeds were to be made if the conditions precedent were not met. The agreement reiterated that Majestic Pointe was not entitled to disbursement "any time that the Loan [was] not In Balance or for payment of the Project Costs other than in strict accordance with the Project Budget." The agreement emphasized that "it is expressly understood and agreed that the Loan at all times shall be In Balance." Majestic Pointe also agreed to contribute funds, should the loan fall out of balance. Its failure to do so would constitute an event of default.

Before entering into the agreement with Majestic Pointe, National City hired the consulting firm Landmark Contract Management, Inc. (Landmark), to review the project's budget and scope of work. Landmark's December 2005 initial feasibility report warned that the general contractor, Kidwell Construction, Inc. (Kidwell Construction), had not prepared plans or project specifications, a detailed budget, or a formal construction schedule.[3] The architectural drawings that Kidwell Construction had provided "[were] not, in [Landmark's] opinion, to the level of completeness that we would typically expect to see for the purposes of bidding." Based on the information provided, Landmark could not develop a detailed cost estimate, but it believed that Kidwell's estimate understated the overall cost by $3.79 to $4.75 million.

Despite the shortcomings set forth in the initial feasibility report, National City and Majestic Pointe entered into the construction loan agreement on March 13, 2006. Majestic Pointe signed two promissory notes to obtain the earlier agreed-upon $21,280,000 from National City. The notes were secured by a construction deed of

_____

[3]Ross Kidwell owned Kidwell Construction and was part owner of Majestic Pointe.

trust, a security agreement, an assignment of leases and rents, and a fixture filing (collectively, deed of trust).

Fidelity issued the title insurance policy to National City on March 15, 2006, which provided $21,280,000 in coverage. Fidelity later issued an endorsement that changed the effective date of the policy to October 25, 2007, and which increased the amount of coverage by $1.1 million to account for a second loan made by National City.

After the loan opened, National City began receiving disbursement requests from Majestic Pointe. Landmark reviewed those requests by going to the job site, meeting with the project manager, reviewing the pay applications, identifying the progress that had been made, and comparing the progress with the amounts set forth on the disbursement requests. Landmark's progress reports advised that the disbursement requests did not include a schedule of values, that Kidwell Construction had not developed a formal project schedule, and that Landmark could not determine whether the loan funds were sufficient to complete the project because it did not have a full schedule of values. Moreover, not all of the disbursement requests were approved by an architect, and Landmark assumed that National City had secured the appropriate lien waivers before disbursing funds. Although construction lenders often use title insurance companies to disburse loan proceeds, National City disbursed funds directly to Majestic Pointe.

Upon receiving a schedule of values in December 2007, National City became aware that Kidwell Construction had paid itself approximately $681,000 of a $1 million fee that was supposed to be deferred until the construction loan was repaid. Landmark also reviewed the schedule of values and advised National City that there were insufficient funds to pay for finishes and site improvements. By March 2008, National City had ceased funding Majestic Pointe's disbursement requests, having paid out all but approximately $1.2 million of the total loan balance.

A receiver was appointed in October 2008 to preserve, protect, and stabilize the Majestic Pointe development. Between April 29, 2008, and December 23, 2009, Kidwell Construction, along with thirteen subcontractors, filed mechanics' liens against the property, claiming that more than $7 million was owed to them.

Captiva purchased the promissory notes and other loan-related documents from National City on July 22, 2009, for $2 million and became the insured under the policy as the successive owner "of the indebtedness secured by the insured mortgage." Captiva notified Fidelity of a claim on August 3, 2009, and demanded that Fidelity protect it against any loss by reason of the mechanics' liens, specifically demanding that Fidelity defend Captiva and pay off the enforceable liens.

In support of its argument that Exclusion 3(a) applies when an insured undertakes intentional, affirmative action that gives rise to the matter for which coverage is sought, Fidelity cited BB Syndication Services, Inc. v. First American Title Insurance Co., 780 F.3d 825 (7th Cir. 2015), Brown v. St. Paul Title Insurance Corp., 634 F.2d 1103 (8th Cir. 1980), and First Assembly Church of West Plains v. Ticor Title Insurance Co., 872 S.W.2d 577 (Mo. Ct. App. 1994).

The district court concluded, however, that the exclusion would apply only if Fidelity "show[ed] intentional misconduct, breach of duty, or otherwise inequitable dealings by National City Bank, or that recovery for individual lien claims would amount to an unwarranted windfall because National City received the benefit of the work reflected in the liens without disbursing payment." Fidelity Nat'l Title Ins. Co. v. Captiva Lake Invs., LLC, 941 F. Supp. 2d 1121, 1130 (E.D. Mo. 2013) (internal quotation marks omitted). Although the district court denied Captiva's motion *in limine* to exclude evidence related to Exclusion 3(a), it ruled that Fidelity would have to present evidence of misconduct before the court would submit the Exclusion 3(a) defense to the jury. During a pretrial conference, the court expressed doubt that Fidelity's evidence was sufficient to meet that standard:

I think that most of what you mentioned shows negligence, mismanagement, maybe downright stupidity or recklessness, but it certainly doesn't show misconduct, which to me connotes some intentional wrongful act that was designed to do harm to somebody or something.

After accepting Fidelity's offer of proof, the district court excluded the proffered evidence. Fidelity argues that the district court erred in so ruling. We review a district court's evidentiary rulings for abuse of discretion. Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 343 (8th Cir. 2009). A district court "abuses its discretion when it makes an error of law." Id. (quoting United States v. Two Elk, 536 F.3d 890, 900 (8th Cir. 2008)). The interpretation of an insurance policy is a question of law that we review *de novo*. United Fire & Cas. Co. v. Titan Contractors Serv., Inc., 751 F.3d 880, 883 (8th Cir. 2014).

The parties agree that Missouri law governs this diversity action. Accordingly, we are bound by the decisions of the Missouri Supreme Court. United Fire & Cas. Co., 751 F.3d at 883. If that court has not addressed an issue, however, "we must predict how the court would rule, and we follow decisions from the intermediate state courts when they are the best evidence of Missouri law." Id. (quoting Dannix Painting, LLC v. Sherwin-Williams Co., 732 F.3d 902, 905 (8th Cir. 2013)).

Fidelity argues that National City "created, suffered, assumed or agreed to" the mechanics' liens by reason of its failure to enforce the conditions set forth in the construction loan agreement that would have protected it from the mechanics' liens. Fidelity contends that the liens arose from National City's intentional conduct—its improvidence in opening the loan and its failure to monitor the loan—and thus any loss or damage caused by the mechanics' liens should be excluded from coverage under Exclusion 3(a). Relatedly, *amici curiae* argue that the mechanics' liens "arose because of [National City's] deliberate decision to stop funding the Project prior to

disbursing all of the loan proceeds where the Project had insufficient funds." *Amici Curiae* Br. 4.

Exclusion 3(a) is the most litigated clause in standard title insurance policies. BB Syndication Servs., 780 F.3d at 826. It excludes liens "created, suffered, assumed or agreed to" by the insured. The exclusion is standard language in title insurance policies, "but it can't apply any time the construction lender could have prevented a mechanic's lien from arising," because a lender can always prevent a mechanic's lien from arising by simply paying the contractor. Id. at 831. Accordingly, to give the exclusion meaning, "most courts imply a fault requirement." Id.; see Chicago Title Ins. Co. v. Resolution Tr. Corp., 53 F.3d 899, 907 (8th Cir. 1995); see also Brown, 634 F.2d at 1107 n.8 (noting that "[t]he cases discussing the applicability of the 'created or suffered' exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured").

We conclude that Exclusion 3(a) can apply under Missouri law even if the insured did not engage in intentional misconduct or inequitable dealings. See Brown, 634 F.2d at 1109-10; First Assembly Church, 872 S.W.2d at 582-83. In Brown, we held that the construction lender's cessation of disbursements following the developer's default under the construction loan agreement "created or suffered" the liens that consequently arose due to insufficient funds. 634 F.2d at 1110. "While [the lender] admittedly was under no obligation to continue funding the project after the default, it seems clear that the parties contemplated that [the lender] would provide adequate funds to pay for work completed prior to the default." Id. Requiring the insurer to indemnify the lender "would give the insured an unwarranted windfall and would place the title insurer in the untenable position of guaranteeing payment of work for which loan funds were never advanced." Id.

-12-

In First Assembly Church, the Missouri Court of Appeals rejected the argument that Exclusion 3(a) applies only if "the defect, lien or encumbrance result[ed] from some intentional misconduct or inequitable dealings by the insured." 872 S.W.2d at 582. In accordance with our decision in Brown, the court concluded that "[w]here the conduct which forms the basis for the claim is intentional and deliberate, as opposed to inadvertent or mistaken, the adverse claim will be considered as having been 'created' and therefore excluded under the policy." Id. at 583. In light of Brown and First Assembly Church (which we acknowledge did not involve a lien), we hold that the district court erred when it required Fidelity to show that National City engaged in intentional misconduct or inequitable dealings and thus abused its discretion when it excluded evidence regarding Fidelity's Exclusion 3(a) defense.

We recognize that in Chicago Title Insurance Co. we rejected the argument that "Brown stands for the proposition that an insured causes liens when it fails to provide sufficient funds to complete a construction project." 53 F.3d at 906. In that case, however, we were looking to Minnesota law to predict how the Minnesota Supreme Court would interpret Exclusion 3(a), whereas in this case we must look to Missouri law in an attempt to predict how the Missouri Supreme Court would rule. See United Fire & Cas. Co., 751 F.3d at 883. We believe that the Missouri Court of Appeals decision in First Assembly constitutes the best evidence of Missouri law on this issue.

We also believe that the Missouri Supreme Court would adopt the well-reasoned analysis of the United States Court of Appeals for the Seventh Circuit in BB Syndication Services, in which the court considered "whether the lender or the title insurer bore the risk of liens arising from the cessation of loan funds due to cost overruns" and concluded that title insurance was not built to bear the risk of insufficient construction funding. 780 F.3d at 833, 839. Because the lender "had the authority and responsibility to discover, monitor, and prevent" the risk of loss, the lender "c[ould] be said to have 'created' or 'suffered' the resulting liens" under Exclusion 3(a). Id. at 839.

-13-

Exclusion 3(a) excludes coverage for liens that arise as a result of insufficient funds. This interpretation makes the most sense of the respective roles of the insured lender and the title insurer in this context. Only the lender has the ability—and thus duty—to investigate and monitor the construction project's economic viability. When liens arise from insufficient funds, the insured lender has 'created' them by failing to discover and prevent cost overruns—either at the beginning of the project or later.

Id. at 836.

### III. Unmarketability of Title

Dan Stegmann (Stegmann), Ben Stegmann, and Jack Davis are real estate investors who formed Captiva to purchase National City's interest in the Majestic Pointe development. They estimated that it would cost approximately $11 million to complete the development. Stegmann testified that Captiva planned to borrow $4.5 or $5 million dollars to complete the exterior of the building and then sell fifteen units at Majestic Pointe, saying, "So that was our plan, to move forward quickly to get this project back on track."

Stegmann explained that the mechanics' liens would have to be resolved before Captiva could borrow money. Captiva believed that "the maximum lien exposure was 300,000, 400,000," even though the lien claimants sought more than $7 million. According to Stegmann, Kidwell Construction had filed an unenforceable $4.5 million lien against the property and certain subcontractors had filed duplicate or otherwise unenforceable liens. Captiva believed that some liens were overstated and that those liens and certain others could be settled for a fraction of the amount claimed. When Captiva's attorney Jack Barnes filed a claim with Fidelity in August 2009 under the policy's mechanics' lien provision, he noted that some claimants were

eager to settle and that "it would be in the best interest of everyone to address [the mechanics' liens] as soon as possible."

Captiva foreclosed on the deed of trust on September 1, 2009, and thereby became the owner of the property. Around that time, a representative from the real estate development company MLake 75, LLC (MLake), contacted Stegmann and expressed MLake's interest in purchasing the Majestic Pointe development.

Lance Perna, senior vice president and senior claims counsel for Fidelity, sent Captiva a letter dated September 8, 2009. Perna wrote that "it appear[ed] likely that the mechanic's lien issues raised in this matter will be covered under the terms of the policy issued to National City Bank, and assigned to Captiva Lake." In an October 1, 2009, letter to Captiva, Perna confirmed that Fidelity would tender the defense for Captiva in the mechanics' lien litigation concerning the Majestic Pointe development, subject to a reservation of Fidelity's rights under the policy. Perna specifically reserved Fidelity's right to deny coverage based on Exclusion 3(a) and indicated that Fidelity was considering whether to retain counsel to assist in coverage determinations. Perna also informed Captiva that Fidelity had retained the law firm Sauerwein, Simon, and Blanchard (Sauerwein) to serve as counsel for Captiva in the mechanics' lien litigation.

Meanwhile, Captiva and MLake negotiated the terms of a potential sale. By early October 2009, MLake had signed a letter of intent to purchase the property. Captiva asked Fidelity's title agent whether Fidelity would continue for MLake the mechanics' lien coverage that it had been providing to Captiva.

Captiva entered into a purchase and sale agreement with MLake (MLake agreement) on November 3, 2009. The contract provided for the sale of the membership interests in Captiva to MLake for a price of $6,550,000 and set a closing date of December 4, 2009. As a condition of closing on the purchase, MLake

required title insurance that provided $10 million in coverage and either full mechanics' lien coverage without excepting the mechanics' liens that already had arisen on the property "or affirmative insurance over mechanic's liens on the Property."

On November 5, 2009, Captiva's attorney Barnes notified Fidelity of Captiva's intent to sell its ownership interest in the Majestic Pointe development and requested coverage in accordance with the terms of the MLake agreement. Days later, Ben Stegmann contacted Fidelity and expressed Captiva's desire to finalize the title insurance policy as soon as possible.

MLake terminated its agreement with Captiva on November 17, 2009, before Fidelity had decided whether to issue the title insurance policy that Captiva had requested. Captiva apparently did not immediately inform Fidelity of the termination, and on December 4, 2009, Fidelity informed Captiva that Fidelity would issue the requested policy only if Captiva posted a $5 million bond. Captiva ultimately declined to do so. An MLake representative later testified that the mechanics' liens were a "deciding factor" in MLake's decision to terminate the agreement.

Captiva grew frustrated with Fidelity and the Sauerwein attorneys. It wanted Fidelity to resolve the mechanics' liens quickly, but Fidelity indicated no intention of doing so. On December 7, 2009, Barnes wrote to Perna, again asserting that Fidelity "had more than adequate time to determine liability under the policy or whether or not there are coverage defenses." He asked Perna to either identify Fidelity's coverage defenses or admit liability under the policy "and agree to furnish the requested title insurance so as not to increase the Insured's loss because of the mechanics' lien claims and the resulting unmarketability of title." In his December 9, 2009, response, Perna explained that Fidelity was still investigating coverage, noting that there were no "time deadlines for [Fidelity] to confirm or deny coverage in this matter as Captiva is currently enjoying the benefits of coverage while the issue

is investigated." Barnes replied, again urging Fidelity to resolve the claims and noting that Captiva "may incur additional damages by reason of the unmarketability of the title resulting from the mechanic's lien claims."

By letter dated August 3, 2010, Captiva made a claim under the policy's unmarketability-of-title provision, alleging that Captiva had been unable to sell the property or obtain a loan to complete construction "due to the uncertainty created by [Fidelity] as to whether or not [it] will insure over the pending mechanic's lien claims."

Judgment was entered in state court in favor of the remaining lien claimants on September 19, 2012. The Missouri Court of Appeals affirmed that judgment, and the Missouri Supreme Court declined to review the case on May 27, 2014. By that time, Fidelity had spent more than $400,000 in defense costs and had paid more than $1.6 million to discharge the liens. In May 2015, Fidelity informed Captiva that it "ha[d] determined not to seek further reimbursement of the . . . sums expended on Captiva's behalf."

In denying summary judgment to Fidelity, the district court "assum[ed], without deciding" that unmarketability coverage was available. Fidelity Nat'l Title Ins., 941 F. Supp. 2d at 1128. The district court submitted the claim to the jury, which found that Fidelity had breached its "obligation to indemnify Captiva for losses and damages resulting from unmarketability of title or lack of priority concerning the mechanics' liens." In a special interrogatory, the jury found that Captiva was entitled to damages for the failed MLake transaction in the amount of $6,284,992.

We review *de novo* the legal question whether the unmarketability-of-title provision covers loss that allegedly arose by reason of unresolved mechanics' liens

that were filed after the effective date of the policy.[4] See Chicago Title Ins. Co., 53 F.3d at 904 (standard of review). We note that it is undisputed that work had begun on the project before the effective date of the title policy and that it is also undisputed that the unresolved mechanics' liens were filed well after the October 25, 2007, "Date of Policy."

Captiva argues that inchoate mechanics' liens clouded the Majestic Pointe development's title on or before the effective date of the policy, thus making the title unmarketable as of that date. Accordingly, the argument goes, Captiva suffered loss that included the failed sale of the property to MLake by reason of "[u]nmarketability of title." Fidelity and *amici curiae* contend that the mechanics' liens did not encumber the property until they were filed, which was well after the Date of Policy. Moreover, they argue that the district court erred in applying the first-spade rule to determine whether the title was unmarketable as of the Date of Policy. They claim that Missouri's first-spade rule applies only to disputes involving the priority of liens.

Captiva primarily relies on Duffy v. Sharp, 73 Mo. App. 316 (Mo. Ct. App. 1898), in support of its argument that "under Missouri law, the existence of inchoate property rights are encumbrances and prevent the conveyance of marketable title." Appellee's Br. 43. In Duffy, after the plaintiff purchased certain real estate from the defendant, three mechanics' liens were filed against the property. The deed contained the words "grant, bargain and sell," which were construed to mean that the "real

---

[4]We reject Fidelity's argument that Captiva did not have standing to recover damages related to the MLake transaction because the MLake agreement identified the sellers as "the owners of all the membership interests in" Captiva. Fidelity's argument relates to whether Captiva was the real party in interest, see Fed. R. Civ. P. 17(a), and not to whether Captiva lacked standing for failing to suffer an injury in fact. Accordingly, we agree with the district court that Fidelity's real-party-in-interest argument was untimely. See Sun Ref. & Mktg. Co. v. Goldstein Oil Co., 801 F.2d 343, 345 (8th Cir. 1986) (holding that a plaintiff waived a real-party-in-interest objection by failing to promptly raise it).

-18-

estate was at the time of execution of such conveyance, free from incumbrance done or suffered by the grantor or any person under whom he claims." Duffy, 73 Mo. App. at 319 (emphasis omitted). The court rejected the defendant's argument that "the mere right to file a lien [was] not an existing incumbrance." Id. at 321. It explained that the defendant, who claimed title to the land through an architectural company, "may not have had actual notice that claims against the buildings were unpaid, but he did know that the houses had been recently constructed and that liens for materials furnished or work done thereon could be filed within six months after the completion of the work." Id. at 324. The court concluded, "[I]t is but reasonable to hold that in making the covenant against incumbrances he contracted to indemnify the plaintiff against such contingent liabilities." Id.

Duffy does not necessarily answer the question presented in this case, because although the mechanics' liens in that case were inchoate "at the time of execution" of the deed, their filing was imminent, they were based on work that the defendant knew had been completed, and the defendant had agreed to indemnify the plaintiff against contingent liabilities. Id. at 324.

Captiva argues that because work had begun on the condominium development before the effective date of the policy, there was a possibility that mechanics' liens might be filed. But it has not shown that any inchoate liens that existed on October 25, 2007, ever materialized. Stated differently, Captiva has not shown that the contractors and suppliers who were owed money as of October 25, 2007, were not paid; that those contractors or suppliers then filed mechanics' liens to recover the money owed to them; and that those liens rendered the title unmarketable. Unlike the defendant in Duffy, who knew the work was complete, Fidelity knew only that work had begun. While Duffy, assuming that the Missouri courts would find it applicable, might require Fidelity to restore the marketability of the title by resolving liens that could have been filed on October 25, 2007, an issue on which we do not rule, we

decline to extend the holding in that case to include any and all liens that were filed after that date.

We next consider whether the district court erred in applying the first-spade rule to conclude that "the mechanics' liens in this case 'relate back' to the commencement of construction, a date which precedes October 25, 2007." Fidelity Nat'l Title Ins., 941 F. Supp. 2d at 1127. We conclude that although Missouri law gives priority to later-filed mechanics' liens over earlier-filed liens of a different nature, see Mo. Rev. Stat. §§ 429.010 et seq., it does not allow the date of those later-filed mechanics' liens to relate back to the date work began for the purpose of coverage under a title insurance policy's unmarketability-of-title provision.

Missouri Revised Statutes section 429.010 sets forth the circumstances in which a contractor or supplier may "have" a mechanics' lien. It provides, in relevant part:

> Any person who shall do or perform any work or labor upon land . . . , upon complying with the provisions of sections 429.010 to 429.340, shall have for his or her work or labor done . . . a lien upon such building, erection or improvements, and upon the land belonging to such owner or proprietor on which the same are situated . . . to secure the payment of such work or labor done . . . .

"Once a mechanic's lien arises under section 429.010, it must be filed properly with the relevant county's circuit clerk to be enforceable." Bob DeGeorge Assocs., Inc. v. Hawthorn Bank, 377 S.W.3d 592, 598 (Mo. 2012). Mechanics' liens must be filed with the clerk "within six months after the indebtedness shall have accrued." Mo. Rev. Stat. § 429.080. Section 429.010 thus indicates that—to have a lien—a contractor or supplier must comply with the statutory requirements, including filing a lien with the proper circuit clerk within six months.

The filing of a mechanic's lien with the circuit clerk, however, "is irrelevant for the purpose of determining first-in-time priority between competing encumbrances on real property." Bob DeGeorge Assocs., 377 S.W.3d at 598. Under section 429.060, a mechanic's lien attached to the land is given relation-back priority to the date on which work on the land commenced, thus codifying the concept known as the first-spade rule, which "has been part of the Missouri law since at least 1855." Drilling Serv. Co. v. Baebler, 484 S.W.2d 1, 8 (Mo. 1972). The Missouri Supreme Court has explained the first-spade rule as follows:

> All mechanics' liens commence at the date of the first stroke of the ax or spade, and continue in the erection of the house, without regard to the time of their being filed, or of the doing of the work or furnishing the materials. The man who does the last of the painting or plumbing comes *in par[i] passu* with him who built the foundation wall.

Hammond v. Darlington, 84 S.W. 446, 449 (Mo. Ct. App. 1904) (quoting In the Matter of Denkel's Estate, 1 Pearson 213 (Pa. Ct. of Common Pleas, Dauphin Cty. 1862)). In other words, "[s]o long as a mechanic's lien arises on the land and is filed properly, it will have priority over any third-party encumbrance attaching after the date work began." Bob DeGeorge Assocs., 377 S.W.3d at 598.

Missouri courts apply the first-spade rule to resolve disputes involving the priority of competing liens. The statutes "are construed favorably to uphold the rights of laborers and materialmen," id., because the first-spade rule is "based on and justified by the principle that those who have contributed labor or material to the improvement of property are entitled to look to the property for compensation," Putnam v. Heathman, 367 S.W.2d 823, 828 (Mo. Ct. App. 1963). See Johnson v. Brill, 295 S.W. 558, 562 (Mo. 1927) (explaining that Missouri's mechanics' lien statutes are "said to be equitable in their purpose or to have an equitable basis; their aim and purpose being to do substantial justice between the parties" (citation omitted)).

-21-

Captiva has cited no cases that apply the first-spade rule to determine the date on which unresolved mechanics' liens rendered the title unmarketable, and we decline to extend the rule's scope such that it would govern the determination of that date. Unmarketability-of-title coverage "means that the insured will be indemnified for loss due to a finding that the title is unmarketable because of a defect which existed *prior to* the policy's effective date." 1 Joyce Palomar, Title Insurance Law § 5.7 (2017 ed.), Westlaw (database updated Sept. 2017). Such coverage "does not insure that the title will remain marketable in the future." Id.; see Crossman v. Yacubovich, 290 S.W.3d 775, 779 (Mo. Ct. App. 2009) (explaining that title insurance "seeks to eliminate risk of loss arising from past events" and does not "assum[e] risk of loss for future events").

Fidelity argues that "mechanics' liens are not encumbrances against title unless and until a written lien statement is filed." Appellant's Br. 37; see also *Amici Curiae* Br. 11 (arguing that the district court "erred in extending the Policy's unmarketability of title coverage to mechanic's liens first appearing of record *after* the Policy was issued"). The policy, however, defines "unmarketability of title" as "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest . . . to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." The policy thus does not limit coverage to perfected liens, and an inchoate lien could meet the definition of "an alleged or apparent matter affecting the title to the land." See Duffy, 70 Mo. App. at 322 ("[T]he right of a mechanic to file a lien at the time a conveyance is made, is an incumbrance within the meaning of a covenant against incumbrances."); see also Palomar, supra, § 6:29 ("Title insurers are willing . . . to cover mechanic's liens that arise from improvements or work related to the land which were contracted for or commenced before the date of policy.").

Assuming without deciding that inchoate liens meet the policy's "unmarketability of title" definition, Captiva has not established that Fidelity breached its obligation to insure "as of Date of Policy . . . against loss or damage . . . sustained or incurred by the insured by reason of . . . [u]nmarketability of title." As recounted above, Captiva has not shown that title was rendered unmarketable by mechanics' liens filed by contractors and suppliers who were owed money as of the Date of Policy. It thus cannot show that it suffered damages caused by Fidelity's failure to resolve liens that were inchoate as of October 25, 2007, and which were later filed against the Majestic Pointe development.

IV. Tortious Interference Claim

Fidelity agreed to defend Captiva subject to a reservation of rights, meaning that Fidelity offered "to defend its insured but reserve[d] the right to later disclaim coverage." Heubel Materials Handling Co. v. Universal Underwriters Ins. Co., 704 F.3d 558, 563 (8th Cir. 2013) (quoting Truck Ins. Exch. v. Prairie Framing, LLC, 162 S.W.3d 64, 88 (Mo. Ct. App. 2005) (per curiam)). Fidelity notified Captiva that it had retained the Sauerwein law firm to defend Captiva only in the mechanics' lien litigation and that the firm's representation did not include legal advice about any coverage issues under the policy.

Martin Blanchard, the attorney who managed the mechanics' lien litigation, testified that Fidelity had hired the Sauerwein firm to defend the priority of Captiva's deed of trust in the mechanics' lien litigation. He explained that both Fidelity and Captiva were his clients and that Fidelity controlled the litigation. Blanchard testified that he did not assist Fidelity with its coverage defenses and that he would have refused if Fidelity had asked him to do so.

In April 2010, Fidelity advised Sauerwein attorneys that "[t]he adequacy of the work performed, while tied to some extent to the amount due and thus to [the] extent

of the lien, seems beyond the scope of [Blanchard's] retention. Our representation is concerned solely with the validity and priority of the lien." Thereafter, in June 2010, Fidelity asked Blanchard to "[t]ry to buy as much time as you can with" Butler Supply, a lien claimant that had moved for summary judgment. Although Blanchard had advised Fidelity that there were no defenses to the Butler Supply lien, he believed that Fidelity sought additional time to decide whether to respond to the motion or pay the claim. In August 2010, Captiva accused Fidelity of "deliberately interfer[ing] with the right of defense owed to its insured." Fidelity later advised Blanchard to proceed with motions for summary judgment on the remaining lien claims. Fidelity's in-house attorney said that the "goal in that instruction" was to "force the issue of priority to the surface" and possibly "buttress our coverage denial."

Blanchard wrote to Fidelity on May 3, 2011, asking whether he should assert additional defenses related to the amounts claimed in certain liens. Blanchard also asked Fidelity "to provide Captiva with a letter confirming the scope of our retention as its counsel." In response to Blanchard's request, Fidelity wrote to Captiva on May 13, 2011, stating that "only the validity, priority, and enforceability of the lien as insured is defended" and that although Fidelity had the right to assert quality-of-construction affirmative defenses, it was under no obligation to do so.

In its claim for tortious interference with business expectancy, Captiva alleged that Fidelity without justification "interfer[ed] with . . . Captiva's attorney-client relationship with the Sauerwein firm" and "direct[ed] the Sauerwein firm to take actions inconsistent with [Captiva's] rights." Captiva called as an expert witness at trial the Honorable Glenn Norton, who opined that Fidelity had offered Captiva a complete defense in the mechanics' lien litigation but that it decided to limit the defense in April 2010, when it instructed Sauerwein that its representation was limited to defending the validity and priority of the lien. Judge Norton testified that Captiva had a right to know that the Sauerwein firm was not fully defending them, yet Fidelity did not inform them of the limitation until 2011. Moreover, Judge Norton

-24-

testified that Fidelity's instructions to delay resolving the Butler Supply lien and to file summary judgment motions in the mechanics' lien litigation were inappropriate because they were meant to put Fidelity in a better position to deny coverage.

On cross-examination, however, Judge Norton conceded that the insurance company controls the litigation, and accordingly agreed that Fidelity had the right to evaluate the claims against Captiva and decide whether to settle those claims or litigate them. Although he testified that "[t]he Sauerwein firm was not handling this matter in a fashion that Captiva wanted them to," he could not identify what the attorneys should have done to resolve the litigation more quickly.

At the close of Captiva's evidence, the district court granted Fidelity's motion for judgment as a matter of law on Captiva's tortious interference claim. It determined that Captiva had failed to establish the elements of absence of justification or damages caused by Fidelity's conduct.

> Captiva's evidence establishes that Fidelity at all times had the right to control the litigation. And Judge Norton said that . . . [Fidelity] had that right . . . . [I]t wasn't in a way that Captiva agreed with, and in Captiva's mind maybe it was in a way that was detrimental to their interest, but still they had the right to run the litigation. So Fidelity did exactly what it had the right to do.

The district court also noted that Captiva might not have known the extent to which Fidelity was controlling the litigation, but it "always knew what [Sauerwein] was or was not doing." The district court rejected Captiva's claims that it could not make informed decisions about whether to hire its own defense attorneys or whether to pay the mechanics' liens. "[T]he fact that there were these behind-the-scenes goings on . . . did not prevent Captiva from doing the things that it could have done all along." The district court also determined that Captiva did not show that it suffered harm "caused by this interference by Fidelity and to this attorney/client relationship."

-25-

We review *de novo* the district court's decision to grant Fidelity's motion for judgment as a matter of law, viewing the evidence in the light most favorable to Captiva. See Liberty Mut. Fire Ins. Co. v. Scott, 486 F.3d 418, 422 (8th Cir. 2007) (standard of review). We affirm only "[i]f a party has been fully heard on an issue during a jury trial" and "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A claim for tortious interference with a contract or business expectancy requires proof of the following elements: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." Nazeri v. Mo. Valley Coll., 860 S.W.2d 303, 316 (Mo. 1993).

Captiva argues that the district court erred in determining that there was no legally sufficient evidentiary basis to find that Fidelity acted without justification. Under Missouri law, a plaintiff has the burden of establishing lack of justification. Id. at 316-17. "If the defendant has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." Id. at 317. The Missouri Supreme Court has defined "improper means" as "those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." Id. The defendant has not used improper means it "had an unqualified legal right to do the act complained of." Id.

The policy gave Fidelity the legal right to control the litigation. Under paragraph 4(b) of the policy's conditions and stipulations, Fidelity had the right, at its own cost, to pursue "any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage

to the insured." Moreover, paragraph 4(c) allowed Fidelity to "pursue any litigation to final determination by a court of competent jurisdiction" and, "in its sole discretion, to appeal from any adverse judgment or order." Accordingly, Fidelity acted within its rights when it decided to defend against the validity and priority of the mechanics' liens and when it instructed Blanchard to file motions for summary judgment. As Judge Norton explained, "[t]he insurance company gets to run the litigation," which includes making the decision whether to settle or litigate the mechanics' liens claims.

Captiva claims that Fidelity used the Sauerwein attorneys to further Fidelity's interest in denying coverage to Captiva, employing the following improper means to do so: (1) without telling Captiva, Fidelity limited Captiva's defense when it instructed the Sauerwein attorneys that their representation involved only the validity and priority of the liens; (2) Fidelity instructed Blanchard to "buy as much time as you can" in responding to Butler Supply's motion for summary judgment; and (3) Fidelity instructed Blanchard to proceed with motions for summary judgment, with hopes that the lien claimants would cross-move for summary judgment and thereby require the state court to determine whether National City had waived priority of its deed of trust.

Although Captiva states that Fidelity "used improper means when it misled Captiva into thinking it was receiving a full defense," the substance of Captiva's argument challenges Fidelity's decision to litigate the lien claims and its refusal to settle them. Appellee's Br. 82. For example, Captiva argues that the Sauerwein attorneys knew that Captiva would be "confuse[d] and frustrate[d]" upon discovering that the defense did not include challenging the lien amounts "because Captiva was eager to resolve the liens so that it could move the project forward." Id. at 81. Similarly, Captiva claims that Sauerwein's failure "to reduce inflated liens and resolve them" strained the attorney-client relationship. Id. Captiva's argument is based on a false premise: that Fidelity would have agreed to settle the lien claims, if

only Sauerwein had negotiated with the lien claimants to reduce the lien amounts. As set forth above, Fidelity had the right under the policy to decide whether to settle or litigate the mechanics' lien claims.

Moreover, we agree with the district court that "Captiva always knew what [Sauerwein] was or was not doing." Although Fidelity might well have been more explicit about its limitation of the defense, the Sauerwein attorneys kept Captiva well-informed of the defense they were providing to Captiva. Blanchard and his associate regularly sent lengthy letters that detailed the status of each mechanics' lien claim, and they frequently communicated with Captiva by phone or email. Blanchard had investigated the amounts of the liens through interrogatories, document requests, and depositions, but he testified that by late 2010, his investigation had not revealed "any information from any source that there was a legitimate question that a lien claimant was claiming a lien for amounts where the work had not been done or the materials not been supplied." Accordingly, when Captiva requested that an expert be hired to investigate the amount of the liens, Blanchard advised against it in a December 2010 letter, explaining that the use of an expert to inspect the property can serve to establish a lien and can "weigh[] heavily in a judge's mind in favor of granting a lien." The frequent and thorough communication by the Sauerwein attorneys belies Captiva's claim that Fidelity misled it into thinking that its defense included challenging lien amounts, and we thus cannot say that Fidelity's conduct constituted "improper means," as that term is defined under Missouri law.

Fidelity's instruction to Blanchard to "buy time" in the Butler Supply summary judgment briefing and its later instruction to proceed with motions for summary judgment constituted litigation strategy decisions. Captiva argues that those instructions demonstrate that Fidelity wrongly used Sauerwein attorneys to advance coverage defenses. Although the evidence suggests that the Sauerwein attorneys knew of Fidelity and Captiva's coverage dispute, there is no evidence that they assisted Fidelity in any effort to deny coverage. There also was no evidence that the

Sauerwein attorneys did anything to delay the Butler Supply summary judgment briefing. Finally, the evidence did not show that the decision to file motions for summary judgment was contrary to Captiva's interest or that it caused Sauerwein to breach its fiduciary duties.

Captiva concedes that the policy gave Fidelity "some rights to control the litigation." Appellee's Br. 84. It argues that Fidelity's actions were nonetheless improper, however, because the policy required Fidelity to exercise those rights diligently. Captiva contends that "there is no right to control without diligence." Id. Paragraph 4(b) of the policy's conditions and stipulations provided that "[i]f [Fidelity] shall exercise its rights under this paragraph, it shall do so diligently." Any failure of Fidelity to exercise its rights diligently, however, would be grounds for a breach of contract claim and not a tortious interference with business expectancy claim.

Conclusion

We affirm the district court's grant of Fidelity's motion for judgment as a matter of law on Captiva's claim for tortious interference with business expectancy. We vacate the judgment on the jury's award and remand the case for proceedings consistent with the views expressed in this opinion. We also vacate the order awarding attorneys' fees and costs to the plaintiff.

_____

-29-